## Philadelphia, Appellant, *v.* Pennsylvania Public Utility Commission.

Argued January 20, 1953. Before Rhodes, P. J., Hirt, Reno, Dithrich, Ross and Gunther, JJ.

*Harold E. Kohn,* Special Deputy City Solicitor, with him *William T. Coleman, Jr.,* Assistant Special Deputy City Solicitor, and *Abraham L. Freedman,* City Solicitor, for City of Philadelphia, appellant.

*Clarence M. Freedman,* Assistant Counsel, with him *Thomas M. Kerrigan,* Assistant Counsel, and *Lloyd S. Benjamin,* Acting Counsel, for Pennsylvania Public Utility Commission, appellee.

*Hamilton C. Connor, Jr.,* with him *Peter Platten, M. Carton Dittmann, Jr., Allen Hunter White,* and *Ballard, Spahr, Andrews & Ingersoll,* for Philadelphia Transportation Company, intervening appellee.

OPINION BY RHODES, P. J., March 9, 1953:

On February 29, 1952, the Philadelphia Transportation Company filed with the Pennsylvania Public Utility Commission new tariffs prescribing increased bus and rail fares. The tariffs provided for the elimination of the token rate of 13 1/3 cents (3 tokens for 40 cents) for a single vehicle ride and for the charging

of a straight 15 cent fare; for an additional 3 cent charge for two vehicle rides; and for an increase in the suburban zone fare from 8 cents to 10 cents. The former tariffs had been in effect from February 6, 1951.

The City of Philadelphia, on March 8, 1952, filed a complaint with respect to the new tariffs.

The Commission on March 24, 1952, suspended the operation of the new tariffs from April 1, 1952, their proposed effective date, to October 1, 1952, and by an order of the same date instituted an investigation on its own motion for the purpose of determining the fairness, justness, reasonableness, and lawfulness of the rates and charges for transportation service of the Company, including those in the proposed tariffs. On September 22, 1952, the Commission extended the suspension period for an additional three months to January 1, 1953.

On March 29, 1952, the Company had filed a petition for temporary rates. On July 1, 1952, the Commission entered an order prescribing temporary rates for the Company. This Court, on July 17, 1952, after an appeal filed by the City and after hearing, granted a supersedeas staying the said order of the Commission prescribing temporary rates. Thereafter, on August 6, 1952, this Court, on petition of the Company, remanded the temporary rate proceeding to the Commission for further hearing and consideration.

Consolidated hearings in the Commission's own investigation and in the various complaint proceedings were then held by the Commission. The Company later formally withdrew its petition for temporary rates. On December 23, 1952, the Commission issued its order dismissing the complaints and vacating the suspension of the proposed tariffs. The City of Philadelphia, on December 26, 1952, filed with this Court its petitions for

appeal and supersedeas. On December 30, 1952, this Court, after hearing, denied the supersedeas. The new rates accordingly became effective on December 31, 1952.

The Commission in its final order of December 23, 1952, found that the rates proposed in the new tariffs —Tariff Rail-Pa. P.U.C. No. 17 and Supplement No. 66 to Tariff Bus-Pa. P.U.C. No. 4—would not produce an excess in fair return upon the fair value of the Company's plant; and that the rate structures contained no unlawful discrimination. The Commission also found that the Company's net annual income available for return under the proposed tariffs would be $5,001,905 which was an acceptance of the Company's estimated yield.

On this appeal from the Commission's order the City's contentions may be summarized as follows:

(1) That the Commission has no jurisdiction over City-owned high speed lines; (2) that the Commission could not authorize an increase in rates without the consent of the City to such increase under the agreement of July 1, 1907, between the City and the Philadelphia Rapid Transit Company, predecessor to the Philadelphia Transportation Company; (3) that the return under the new tariffs will be grossly excessive; (4) that the Commission erred in failing to make a finding of fair value of the Company's property as it exists today.

JURISDICTION: The City has contended throughout these proceedings that the Commission has no jurisdiction over the City-owned high speed lines and facilities which are leased by the City to the Company. These lines are the Broad Street Subway, Frankford Elevated, and Bustleton Surface Lines.

The City-owned lines and facilities were leased to the Company under various lease agreements which

were approved by the Commission. The Company has operated its own facilities together with the City-owned lines and facilities as a single unified transportation system, and the same general rate structure has been applicable to all parts of the unified system regardless of ownership of the different parts thereof. The various leases between the Company and the City provided that the rates of fare charged on the City-owned lines shall be the same as the rates charged by the Company on its lines.

The Public Service Company Law of July 26, 1913, P. L. 1374, and its amendments (repealed), expressly exempted municipal corporations from its provisions. Section 1 of that Act defined the term "Facilities" as including "all plant and equipment of a public service company, which includes all tangible real and personal property, . . . owned, operated, leased, licensed, used, controlled, furnished, or supplied for, by, or in connection with, the business of any public service company: Provided, however, That no property owned by the Commonwealth of Pennsylvania, or municipality thereof, at the date when this act becomes effective, shall be subject to the Commission or to any of the terms of this act, except as elsewhere provided herein." Under the Act of 1913, it was held that the exemption from Commission jurisdiction, as to rate regulation, applied to a municipally owned plant operated under a contract by an agent of the City. *Ferguson and McDowell v. Public Service Commission,* 82 Pa. Superior Ct. 238. See *Wilson v. Public Service Commission,* 116 Pa. Superior Ct. 72, 176 A. 510; *Barnes Laundry Co. v. Pittsburgh,* 266 Pa. 24, 109 A. 535.

Section 2 (10) of the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS §1102, contains a provision similar to the Act of 1913 defining "Facilities" of a public utility and exempting property owned by a mu-

nicipal corporation. This section provides as follows, the italicized words being added by the amendatory Act of March 21, 1939, P. L. 10, No. 11: " 'Facilities' means all the plant and equipment of a public utility, including all tangible and intangible real and personal property without limitation, and any and all means and instrumentalities in any manner owned, operated, leased, licensed, used, controlled, furnished, or supplied for, by, or in connection with, the business of any public utility: Provided, however, That no property owned by the Commonwealth of Pennsylvania, *or any municipal corporation thereof*, at the date when this act becomes effective shall be subject to the commission or to any of the terms of this act, except as elsewhere *expressly* provided herein."

Section 301 of the Act of 1937, 66 PS §1141, provides as follows, the italicized words being added by the amendatory Act of March 21, 1939, P. L. 10, No. 11: "Every rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable, and in conformity with regulations or orders of the commission: Provided, That [any] *only* public utility service being furnished or rendered by a municipal corporation, *or by the operating agencies of any municipal corporation,* beyond its corporate limits, shall be subject to regulation and control by the commission as to rates, with the same force, and in like manner, as if such service were rendered by a public utility." It has been assumed under section 2 (10) and section 301 of the Act of 1937, as amended by the Act of 1939, 66 PS §§1102, 1141, that the Commission has no jurisdiction as to rates, where service is rendered by a municipal corporation or its operating agent, on property or facilities of the municipality within the city limits. Cf. *Graham v. Philadelphia*, 334 Pa. 513, 528, 6 A. 2d 78; *Ambridge Borough*

*v. Pennsylvania Public Utility Commission,* 137 Pa. Superior Ct. 50, 8 A. 2d 429.

The Company, the operating lessee, is a public utility and therefore subject to the jurisdiction of the Commission. *New Street Bridge Co. v. Public Service Commission,* 271 Pa. 19, 114 A. 378. And in determining what are reasonable rates to be charged by the Company on its lines the Commission may consider the revenues and expenses of the Company on the lines leased from the City. No question is involved here as to the jurisdiction of the Commission as to rates for a public service furnished by the City, or by the operating agent of the City, on lines or property owned by the City. The rates charged on the City-owned lines are determined by the lease agreements. The question whether the Company makes a profit or suffers a loss on the lines leased from the City, if considered separate and apart from the Company's lines and property, is not determinative of the right of the Commission in regulating the rates charged by the Company on its lines to consider the revenues and expenses of the Company as lessee of the City-owned lines. Cases relied on by the City as denying the jurisdiction of the Commission on the City-owned lines in the present appeals, such as *Wilson v. Public Service Commission,* supra, 116 Pa. Superior Ct. 72, 176 A. 510; *Graham v. Philadelphia,* supra, 334 Pa. 513, 6 A. 2d 78; and *Ambridge Borough v. Pennsylvania Public Utility Commission,* supra, 137 Pa. Superior Ct. 50, 8 A. 2d 429, are not controlling for the reasons stated.

THE CITY-COMPANY AGREEMENT OF 1907: The agreement of July 1, 1907, entered into between the City and the present Company's predecessor defines and regulates the relations between the parties, provides for direct payments to the City by the Company in lieu of license fees and to cover the cost of street

maintenance, and provides for the ultimate acquisition by the City of the property of the Company. Paragraph 8 of the agreement reads as follows: "Provided, however, that the present rates of fare may be changed from time to time but only with the consent of both parties hereto; . . ."

The City argues that the Company under this agreement has no right to initiate an increase in rates without the consent of the City. The City has not been deprived of any of its rights under the agreement by reason of Commission regulation of the Company's rates in the present proceeding (*City of Philadelphia v. Public Service Commission*, 83 Pa. Superior Ct. 8; cf. *Philadelphia v. Pennsylvania Public Utility Commission*, 164 Pa. Superior Ct. 96, 100, 63 A. 2d 391), and, even if this were the case, the matter could not be determined in the present proceeding.

NET INCOME AVAILABLE FOR RETURN: The Commission found that the new tariffs would produce an estimated annual income of $5,001,905, representing a return of 6½ per cent on $76,952,000. The Commission further found that this amount is not in excess of a fair return upon any fair value that the Commission would be justified in finding.

The Company's need for the present rate increase is based upon its estimate that, although net income for the twelve months ended July 31, 1952, was $2,-557,037, for a projected year ending July 31, 1953, under the same rates, there would be no return but a deficit of $103,429. This estimated decline in the Company's net income for a projected year ending July 31, 1953, is based upon an estimated decline of $1,878,876 in passenger revenue. The Company from actual operating revenues for the twelve months ended July 31, 1952, of $71,564,381 deducted $1,870,709 making estimated operating revenues for the projected year end-

ing July 31, 1953, of $69,693,672. These estimates submitted by the Company and made by the Company's personnel were accepted by the Commission and formed the basis for the present fare increase. The estimated decline in passenger revenue of $1,878,876 is based on an estimated loss of about 12,000,000 riders on the system due to downward trend in passenger traffic. This estimated decline for the projected year is in addition to an estimated loss of 20,000,000 passengers due to the new rates. It appears that under the 1952 riding levels the new tariff would produce approximately $10,-000,000 annual net income.[1] It is by forecast of a downward trend in passenger revenues under the tariffs of February 6, 1951, and of a further loss due to the new rates under the tariffs of February 29, 1952, that the Commission estimates the Company's net income available for return under the latter tariffs would be only $5,001,905.

The burden of proof was upon the Company to show that the rates involved under the new tariffs are just and reasonable. Section 312 of the Act of May 28, 1937, P. L. 1053, 66 PS §1152; *Equitable Gas Company v. Pennsylvania Public Utility Commission,* 160 Pa. Superior Ct. 458, 462, 51 A. 2d 497.

Shortly after the oral argument of these appeals in this Court on January 20, 1953, the latest figures showing the Company's income and earnings for the calendar year ended December 31, 1952, were available and were submitted to the Court by the Company. The record contained information for eleven months of 1952. The complete 1952 figures show actual operating revenues for the calendar year ended December 31, 1952, to be $71,050,552. This gross revenue for the

---

[1] The position of the Company is that operating expenses are not reduced as the result of loss of passengers due to increased fares. (4534a-4536a)

calendar year 1952 is only about $500,000 less than the actual gross revenue of $71,564,381 for the 12 months ended July 31, 1952. But the Company's projected decline under the tariffs of February 6, 1951, in passenger operating revenue for the year ending July 31, 1953, was $1,878,876. For three out of the last four months of 1952, that is, for September, October, and December, the passenger revenues were greater than the corresponding months of the year 1951. The net income of the Company for 1952 was $2,377,876. For the twelve months ended July 31, 1952, such income was $2,577,037. In 1952 non-operating income included was $503,805, and for the twelve months ended July 31, 1952, non-operating income included was $642,540.

The Company attempts to explain the failure of its net income to show any substantial decline from July 31, 1952, to December 31, 1952, by claiming adjustments in the amount of $1,131,220, based on the alleged effect of temporary economy measures such as deferment of track work, wages of furloughed employes, and savings in material used. Adjustments are of course proper where based on substantial evidence. Findings of the Commission in such matters, as in all others, must be supported by substantial evidence. Opinion must have some basis in fact. Speculative estimates unsubstantiated by evidence may not be accepted as true in the face of actual experience and proven data to the contrary. The method used to support the Commission's order allowing the new rates does not reflect true income or experience, but prescribes adjustments which effect the result.

In the *City of Pittsburgh v. Pennsylvania Public Utility Commission*, 171 Pa. Superior Ct. 187, 210, 90 A. 2d 607, 618, we said: "The Commission is given discretionary power to make necessary adjustments to all estimates. But the adjustments must be based on evi-

dence, and cannot be unfairly weighted in favor of either the utility or the consumer. The Commission may not ignore recent information and evidence which substantially affect the problem before it."

We are of the opinion that the conversion of annual earnings of approximately $2,500,000 into a pro forma year loss of $103,000 is not substantiated by the evidence. In forecasting probable future revenues under a given tariff, the Commission must have a certain area of judgment. *Pittsburgh v. Pennsylvania Public Utility Commission,* 168 Pa. Superior Ct. 95, 106, 78 A. 2d 35. However, in the present case, the forecasts, substantially contradicted by actual experience, are of negligible value. In the light of such actual experience we are agreed that the record should be returned to the Commission for reconsideration of the entire problem. The City's contention that other conjectural adjustments are refuted by actual experience may be examined with the aid of information available when the record is again before the Commission. Figures currently available on reconsideration may enable the Commission to arrive at a result that approximates reality.

RATE BASE: The Commission in allowing the prescribed rates under the tariffs filed by the Company on February 29, 1952, did not make any finding of fair value or of a rate base in its order of December 23, 1952. We recognize that such finding is not always necessary, especially where the return is obviously reasonable on any finding of fair value that might be made. *Philadelphia v. Pennsylvania Public Utility Commission,* supra, 164 Pa. Superior Ct. 96, 106, 63 A. 2d 391. Where the rates are imposed on a utility by the Commission or where it appears that the new rates would be unreasonable and in violation of law a finding of fair value is necessary. *Perkasie Sewer Company v. Pennsylvania Public Utility Commission,* 142 Pa. Su-

perior Ct. 262, 16 A. 2d 158; *Philadelphia v. Pennsyl-. vania Public Utility Commission*, 162 Pa. Superior Ct. 425, 430, 57 A. 2d 613. Under the tariffs filed on February 29, 1952, the Company estimated that the proposed rates would increase passenger revenues for the projected year by $5,033,600, and the Commission adopted this estimate as a finding. When the Commission's estimates are considered in relation to true income and expenses, it is impossible to conclude from the record that the return of the Company under the new tariffs would be much less than $6,500,000 after taxes, which would be a return of 6½ per cent on about $100,000,000. The finding of the Commission that the new rates would not produce an excess of a fair return upon any finding of fair value that the Commission would be justified in making is not supported by substantial evidence. Upon return of the record the Commission shall fix and determine reasonable rates which will not yield an excessive return upon fair value.

*Reproduction Costs—Obsolescence.* In determining fair value the weight to be given reproduction cost as a measure of value is for the Commission, but its action must be within the area of its administrative discretion and supported by the evidence. *City of Pittsburgh v. Pennsylvania Public Utility Commission*, supra, 171 Pa. Superior Ct. 187, 195, 90 A. 2d 607; *Pittsburgh v. Pennsylvania Public Utility Commission*, 165 Pa. Superior Ct. 519, 525, 69 A. 2d 844. The Commission in its order recognized that a degree of obsolescence is inherent in the Company's rail operations. Where there is a high degree of obsolescence so that no responsible management would consider the reproduction of a plant under existing circumstances, very little, if any, weight should be given to reproduction costs. As this Court stated in *Pittsburgh v. Pennsylsylvania Public Utility Commission*, 172 Pa. Superior

Ct. 230, 235, 93 A. 2d 715, 717, quoting from *Market Street Railway Co. v. Railroad Commission of California*, 324 U. S. 548, 564, 65 S. Ct. 770, 89 L. Ed. 1171, 1183: " 'No study of the present cost of reproduction is shown, no present fair value is suggested. Nor do we think it important. Apart from familiar objections to the reproduction-cost method, no responsible person would think of reproducing the present plant, consisting in substantial part of cable cars and obsolete equipment. There is no basis for assuming that anyone, in the light of conditions which prevail in the street-surface railroad industry generally, would consider reproducing any street railway system. It was no constitutional error to proceed to fix a rate in disregard of theoretical reproduction costs.' " We have no doubt, from the record in the present appeals, that these considerations apply with much weight to the Company. Under the Company's own pessimistic forecasts of consistently declining user, its system is in a vicious cycle of declining use and rising fares. Such non-user by the public is a factor to be considered by the Commission in relation to obsolescence. This is true notwithstanding that the Commission stated it added $11,000,000 for obsolescence to the depreciation account applicable to original cost.

*Previous Findings of Fair Value.* Findings of fair value previously made either by the Commission or by the Court are not conclusive for the future; and orders fixing rates are not res judicata. *Beaver Valley Water Company v. Pennsylvania Public Utility Commission,* 140 Pa. Superior Ct. 297, 308, 14 A. 2d 205. Valuation is determined by the facts and conditions existing at the time value is in issue. Historically, the present transportation system of the Company was valued by the Commission in 1923 at upwards of $200,000,000 (*City of Philadelphia v. Public Service Commission,* 84

Pa. Superior Ct. 135), and in 1944 this Court fixed a fair value of $93,000,000 on the then existing system (*Philadelphia Transportation Company v. Pennsylvania Public Utility Commission*, 155 Pa. Superior Ct. 9, 30, 37 A. 2d 138). But fair value as found in one proceeding does not determine the present fair value in another. As to the prior adjudication by this Court the Commission in its order made this applicable observation: "We do not understand how a fair value finding, based upon judgment as to the weight to be given various measures of value, can be brought-down unless the exact weighting of each element melding into that judgment can be known."

*Original Cost.* The Commission in its order states that it considered as a measure of value of the Company's system net original cost of $71,679,000. Included in this measure of value is an item for paving in the amount of $8,201,411, which represents franchise payments or paving costs prior to 1907. These payments represent no property owned by the Company and used and useful in the public service. *Philadelphia Transportation Company v. Pennsylvania Public Utility Commission,* supra, 155 Pa. Superior Ct. 9, 25, 37 A. 2d 138. The City asserted that they were in the nature of franchise payments and were deducted as an expense in the years in which the paving was done or the payments made. The charges since 1907, which are in lieu of the paving obligations under the ordinances, are charged off each year to expense. It cannot be said that this $8,000,-000 item included in the Company's book cost, which the Commission adopted as original cost, represents property of the utility used and useful in the public service and entitled to be taken into consideration in the calculation or determination of a rate base. See section 311 of the Act of May 28, 1937, P. L. 1053, 66 PS §1151. In *Pittsburgh v. Pennsylvania Public Utility Commis-*

*sion,* 169 Pa. Superior Ct. 400, 406, 82 A. 2d 515, 518, we said: ". . . the fair value, or the rate base, concerns only the physical assets of the corporation; . . ."[2] Furthermore, recent decisions of this Court make it clear that amounts charged to operating expense cannot be capitalized and included in the rate base. *City of Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 171 Pa. Superior Ct. 187, 199, 90 A. 2d 607; *Pittsburgh v. Pennsylvania Public Utility Commission,* 158 Pa. Superior Ct. 229, 44 A. 2d 614.

*Market Value of Securities.* Market value of securities of the Company is a measure of value to be considered although the weight to be given to it, as to any other measure of value, necessarily varies according to the circumstances. In *Philadelphia Transportation Company v. Pennsylvania Public Utility Commission,* supra, 155 Pa. Superior Ct. 9, 37 A. 2d 138, we held that market value of the securities of the Company was not to be considered by the Commission. Now the facts are different. Since the Company was the result of a reorganization, its securities had been on the market for less than two years when that proceeding was before the Commission. After a period of twelve years we think the market value of the securities of the Company may be taken into consideration by the Commission in the determination of fair value. Under such circumstances there has been a reasonable opportunity for the issues to reflect an appraisal of the valuation of the Company. In 1952 the Company paid a dividend of a dollar a share on the preferred stock and eighty cents a share on the common stock. The market value of its securities as of April 2, 1952, was $50,281,951. In the present case the Commission refused to give any

---

[2] See *Pittsburgh v. Pennsylvania Public Utility Commission,* 370 Pa. 305, 88 A. 2d 59.

consideration to the market value of the Company's securities, basing its action on our decision in *Philadelphia Transportation Company v. Pennsylvania Public Utility Commission,* supra, 155 Pa. Superior Ct. 9, 19, 37 A. 2d 138. For the reasons stated, we think consideration should now be given to the market value of the securities of the Company in a proper determination of fair value. Market value of securities is one of the measures of value under the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS §1101 et seq. *Solar Electric Company v. Pennsylvania Public Utility Commission,* 137 Pa. Superior Ct. 325, 336, 9 A. 2d 447; *Peoples Natural Gas Company v. Pennsylvania Public Utility Commission,* 153 Pa. Superior Ct. 475, 488, 489, 34 A. 2d 375. See *Equitable Gas Company v. Pennsylvania Public Utility Commission,* supra, 160 Pa. Superior Ct. 458, 463, 464, 51 A. 2d 497. The legislature has made no change in the Public Utility Law as construed by those decisions in this respect.

Upon return of the record, the present proceedings should be consolidated with any pending proceedings before the Commission bearing on the question of reasonable rates to be charged by this utility.

The order of the Commission is reversed, the record is remanded for the taking of such additional testimony as may be necessary, and for the making of additional findings to accord with this opinion; and, after the adjustment of the findings upon which the present order is based, to require acceptable tariffs to be filed canceling the tariffs filed on February 29, 1952, and providing for such annual revenues as the Commission may find required to produce the allowed return.

---

OPINION BY HIRT, J., dissenting in part:

The majority opinion in this case advances a radical departure from at least one fundamental and long es-

tablished legal measure of fair value in rate cases involving street railways. The far reaching implications of the holding, in its application to imminent and ever recurring decisions of the Public Utility Commission in cases of this class impels me to record this dissent.

Of course we agree that the Commission had jurisdiction over the city-owned lines, operated by Philadelphia Transportation Company under lease agreements, and that the prior consent of the city was not necessary to increases in passenger rates. And there can be no valid objection to that part of the order remanding the record to the Commission for a consideration of the actual earnings for the year ended July 31, 1953, in comparison with the estimated return, accepted by the Commission as a reliable forecast of net income for the period. Moreover, although it seems obvious that the amount of net income which the company can earn will be less than a fair return on any rate base which this record will support, nevertheless, to put this question at rest, we see no objection to that part of the order directing the Commission to make a finding of fair value.

In my view there is error of law in the invitation of the majority, amounting to a direction addressed to the Commission, to disregard reproduction costs as an element to be considered in determining fair value. Rate making is a procedure created by statute and in 1939 we in *Solar Electric Co. v. P. U. C.*, 137 Pa. Superior Ct. 325, 9 A. 2d 447, interpreted the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS §1151, as requiring a consideration of all elements which have a relevant bearing on fair value, including "the reproduction costs of the property, [of the utility] based upon the fair average price of materials, property and labor", as specifically required by the prior Public Service Company Law of July 26, 1913, P. L. 1374. The

legislature has not seen fit to change the law in that respect. And ever since the Solar decision, and as recently as July 1952, in *City of Pittsburgh v. Pa. P. U. C.*, 171 Pa. Superior Ct. 187, 90 A. 2d 607, this court has consistently adhered to the view that "among the measures of value to be considered are original cost and reproduction cost based upon the fair average price of materials, property and labor". Cf. *Equitable Gas Co. v. P. U. C.*, 160 Pa. Superior Ct. 458, 51 A. 2d 497; *Pittsburgh v. Pa. P. U. C.*, 158 Pa Superior Ct. 229, 44 A. 2d 614; *Peoples Nat. Gas Co. v. Pa. P. U. C.*, 153 Pa. Superior Ct. 475, 34 A. 2d 375.

Reproduction cost as an element of fair value cannot be disregarded in this case because of a "high degree of obsolescence" in the company's property, as assumed by the majority in adopting the city's contention to that effect. The type of obsolescence involved is functional, based upon testimony of a trend in other cities to rubber-tired mass transportation vehicles. In a prior rate case, we in *Phila. Trans. Co. v. Pa. P. U. C.*, 155 Pa. Superior Ct. 9, 37 A. 2d 138 noted a finding of the Commission, as to the extent of the company's operation, of 600 miles of surface track, 23 miles of subway-elevated track, nearly 400 miles of motorbus routes and about 5½ miles of trackless trolley routes. Since then the company has continued its policy of substituting rubber-tired service for surface track routes in some parts of its system. And while the company admits some present functional obsolescence in its service, it has attempted to minimize its effect by a program under which it has set up reserves for the abandonment of additional rail lines and conversion to bus or trackless trolley service from time to time within the next ten years.

Bearing on the city's contention of a "large factor of functional obsolescence applicable to respondent's

rail operations" the Commission in the present order said: "Respondent counters these averments by pointing out the economic waste of replacing rail service by other types of service unless such a shift is entirely justified by compelling reasons disclosed through surveys of individual lines. It is obvious that such factors as peak traffic volume, controlling load points, headway standards and diversity of passenger losses must be given careful consideration in determining if bus or trackless trolley operations should be substituted for rail line operations. Such a substitution in service is also necessarily handicapped because the present laws of the Commonwealth definitely limit the width and length of buses, hence limiting the number of passengers a bus can carry. Respondent also points out that the narrow streets in Philadelphia leave no room for maneuverability of buses and trackless trolleys, and that if trackless trolleys or buses were substituted, the vehicles in question would be required to use the center of the street just as the streetcars now do. *Taking all these factors into consideration, it is our judgment that a degree of obsolescence is inherent in respondent's rail operations, but not to the degree claimed by the City.*" (Italics added.)

My quarrel with the conclusion of the majority, in eliminating reproduction cost as an element of fair value, is that it usurps a function which is exclusively reposed in the Commission by law. There can be little doubt as to that. As recently as in *Pittsburgh v. Pa. P. U. C.,* 168 Pa. Superior Ct. 95, 108, 78 A. 2d 35, referring to the weight to be given similar testimony of obsolescence, we said in approving a finding of the Commission, almost identical with that which is here condemned: "It is true that the Commission did not give that weight to the element of [functional] obsolescence for which the City contends or accept the

theory of its expert. But here again the matter was one for the exercise of judgment by the Commission. Accrued depreciation, including the weight to be given to the element of obsolescence, is essentially a judgment figure." And where as here there is sufficient competent evidence in support of the Commission's finding we are bound by the finding.

In arriving at a finding of original cost the Commission specifically included obsolescence in its estimate of accrued depreciation. If the Commission's finding of reproduction cost does not reflect functional obsolescence, in the degree found, in addition to other items of accrued depreciation, the Commission should be given the opportunity to revise its finding in this proceeding in that respect.

In my view the majority has also arrogated to itself an exclusive function of the Commission in directing it to consider the market value of the Company's securities as an element of fair value. During the past 50 years street railway securities have dropped from near the top, to the very bottom of the list, in investment appeal. In *Phila. Trans. Co. v. Pa. P. U. C.*, supra, we held that the Commission in that proceeding was justified in ignoring market value of this company's securities as an element affecting the rate base. What we there said (pp. 19, 20) is equally applicable here. The Commission in the present case found that the company's financial standing is so impaired that it cannot now raise equity or debt capital and there is justification for the conclusion of the Commission that market value of the Company's securities has no relevant bearing on fair value. The Company's ability to earn a fair return is, at best, uncertain in the present and unpredictable for the future. The depressed market value of its securities indicate their speculative

character in total disregard of the fair value of the property of the utility.

If the majority opinion is to be given effect, the company will be limited to the Commission's finding of original cost less depreciation (which the city contends should be further reduced to less than $42,000,-000) as the present fair value of the company's property for rate purposes. It is not even conceded that original costs should be trended and translated into the average price levels of present day inflated dollar values. We have said: "As present fair value would ordinarily exceed original cost depreciated, . . . it cannot be the only element in the determination of fair value": *Equitable Gas Co. v. P. U. C.*, supra.

The majority not only would limit the company to a return in today's inflationary dollars on yesterday's untrended costs but would further reduce the company's income by insisting that the depressed market values of its securities be given weight in determining the rate base.

I dissent from the views of the majority which will have that result.