Philadelphia, Appellant, *v.* Pennsylvania Public
Utility Commission.

Argued December 29, 1953. Before RHODES, P. J., HIRT, RENO, ROSS, GUNTHER, WRIGHT and WOODSIDE, JJ.

*Harold E. Kohn,* Special Deputy to City Solicitor, with him *William T. Coleman, Jr.,* Assistant Special Deputy to City Solicitor, and *Abraham L. Freedman,* City Solicitor, for appellant.

*Clarence M. Freedman,* Assistant Counsel, with him *Jack F. Aschinger,* Assistant Counsel and *Lloyd S. Benjamin,* Counsel, for Pennsylvania Public Utility Commission.

*Hamilton C. Connor, Jr.,* with him *Peter Platten, Allen Hunter White,* and *Ballard, Spahr, Andrews & Ingersoll,* for Company, intervening appellee.

PER CURIAM, January 19, 1954:

The order of the Pennsylvania Public Utility Commission of December 8, 1953, is affirmed. The opinion of this Court will be filed at a subsequent date.

The order issued by this Court on December 15, 1953, making the appeals a supersedeas of the Commission's order, is vacated, and supersedeas is terminated.

OPINION BY RHODES, P. J., January 25, 1954:

These appeals by the City of Philadelphia relate to orders of the Pennsylvania Public Utility Commission granting fare increases under tariffs filed by the Philadelphia Transportation Company.

In *Philadelphia v. Pennsylvania Public Utility Commission,* 173 Pa. Superior Ct. 38, 95 A. 2d 244, we reviewed an order of the Commission of December 23, 1952, allowing rate increases under tariffs filed Feb-

ruary 29, 1952, by the Philadelphia Transportation Company, which provided for the elimination of the token rate of 13 1/3 cents for a single vehicle ride and for the charging of a straight 15 cent fare. We reversed the order and remanded the record to the Commission (page 55 of 173 Pa. Superior Ct., page 252 of 95 A. 2d) "for the taking of such additional testimony as may be necessary, and for the making of additional findings to accord with this opinion; and, after the adjustment of the findings upon which the present order is based, to require acceptable tariffs to be filed canceling the tariffs filed on February 29, 1952, and providing for such annual revenues as the Commission may find required to produce the allowed return." Upon return of the record we directed that the proceedings should be consolidated with any pending proceedings before the Commission bearing on the question of reasonable rates to be charged by the Company. The City had taken an appeal to this Court from the order of December 23, 1952, and asked that the appeals act as a supersedeas, which request, after hearing, was denied; the rates went into effect on December 31, 1952.

Pending the disposition of the increase in rates under the tariffs filed February 29, 1952, and approved by the Commission on December 23, 1952, the Company, on February 11, 1953, filed new tariffs which were to become effective March 14, 1953. They provided for an increase in the basic charge for single vehicle rides from 15 cents cash to 18 cents cash or two tokens for 35 cents. On March 9, 1953, the Commission suspended the operation of the tariffs for a period of six months until September 14, 1953, and by concurrent order instituted an investigation on its own motion for the purpose of determining the fairness, justness, reasonableness, and lawfulness of the rates and charges for

the transportation services of the Company. The investigation was to include consideration of the prescription of temporary rates under the provisions of section 310 of the Public Utility Law of 1937, 66 PS §1150. On August 24, 1953, the Commission extended the suspension period for an additional three months to December 14, 1953.

The City of Philadelphia, on March 2, 1953, filed its complaint against the proposed rates under the tariffs of February 11, 1953, alleging the proposed rates to be unjust and unreasonable except to the extent they would produce increased revenues as would enable the Company to provide for increased labor costs.

The Commission by its order of December 8, 1953, dismissed the complaints against the tariffs filed February 11, 1953, and directed that the fares contained in said tariffs become effective on or after midnight December 13, 1953, upon the filing of the proper supplements.

The City appealed on December 10, 1953, from the order of the Commission of December 8, 1953. On December 15, 1953, this Court granted a supersedeas and advanced the argument of the appeals to December 29, 1953.

In our opinion in *Philadelphia v. Pennsylvania Public Utility Commission,* supra, 173 Pa. Superior Ct. 38, 95 A. 2d 244, we also directed that the Commission find the fair value of the Company's transportation system; that it consider the factors which relate to actual and functional obsolescence; that it exclude from the rate base payments representing no property owned by the Company and used and useful in the public service, and amounts charged to operating expense; and that market value of securities which had been offered and received in evidence should be considered by the Commission as a measure of value.

The City now contends on the appeals before us that the Commission's fair value finding of $75,000,000 is too high and is not sustained by the evidence in the record; and that the Commission erred in not finding that the new rates would produce an excessive return. The City again questions the Commission's jurisdiction over City-owned high speed lines and facilities which are leased by the City to the Company; and it again argues the effect of the agreement of July 1, 1907, entered into between the City and the present Company's predecessor.

FAIR VALUE—RATE BASE: The Commission in finding the fair value of the Company's physical property used and useful in the public service at $75,000,000 had before it for consideration several measures of value. The measures submitted by the Company were as follows: (1) Original cost; (2) estimated reproduction cost at the spot prices of December 31, 1952; (3) estimated reproduction cost at the average prices for the five years 1948-1952. The Company's original cost figure at December 31, 1952, was $120,984,402; reproduction cost based on spot prices was $314,874,000; and reproduction cost at the average prices for five years was $284,262,000. The Commission adjusted undepreciated original cost to $109,171,040. It disallowed franchise paving in an amount of $8,201,412, direct overheads in an amount of $1,831,950, and indirect overheads in an amount of $1,780,000 or a total of $11,813,362. The Commission adjusted reproduction cost based on spot prices to $298,342,000, and at average prices for five years to $268,420,000. On these measures of value the accrued depreciation was fixed at $53,113,000, $163,567,000, and $146,811,000, respectively. Adding work in progress of $492,500 to the two reproduction cost estimates and $3,000,000 for materials and supplies to the three esti-

mates left for consideration by the Commission the following: Depreciated original cost, $59,058,040; depreciated reproduction cost based on spot prices, $138,-267,500; depreciated reproduction cost at average prices for five years, $125,101,500. The Company's claims for cash working capital and the cost of financing were excluded. The market value of securities was found to be at December 31, 1951, $52,017,885, and at August 31, 1952, $41,154,284. The Commission found that the Company was entitled on a finding of fair value of $75,000,000 to a return of $4,875,000, which is 6½ per cent on the fair value.

From these four measures of value which the Commission had before it for consideration, it does not appear that the Commission abused its administrative discretion in finding the fair value of the Company's system at $75,000,000. As we have so often said, the weight to be given any measure of value in evidence is for the Commission, although its action must be within the area of its administrative discretion and supported by the evidence. It is not bound by any formula in considering the various relevant factors for the determination of a rate base. *City of Pittsburgh v. Pennsylvania Public Utility Commission,* 171 Pa. Superior Ct. 187, 195, 90 A. 2d 607; *Pittsburgh v. Pennsylvania Public Utility Commission,* 168 Pa. Superior Ct. 95, 106, 78 A. 2d 35. A fair and equitable result depends largely on the proper exercise of the Commission's discretionary power.

ORIGINAL COST: The City initially contends that there can be no finding of fair value as there is no original cost study or evidence of depreciated original cost of the Company's property, and that, as the Company has the burden of proof, this failure required the Commission to deny the increased rates. If the Company was unable to show accurately original cost

from its records, it would not be the end of the Company's case as the City says; although the weight to be given to that measure would necessarily be affected by the circumstances. The consolidated record in this rate case, consisting of nearly 10,000 pages of transcript, shows, in our opinion, that the Commission gave extended consideration to the allocation of the questioned items to capital or expense. The weight to be given such evidence, especially where it pertains to the detail and accuracy of disputed accounting practices, was clearly a matter for the Commission. The City also alleges that in any event the Commission's original cost determination of $59,058,040 is excessive. We are unable to find any error of law in this respect. This was a factual matter to be determined by the Commission in the exercise of its discretionary powers, and of course we are not at liberty to substitute our own judgment or discretion for that of the Commission. In finding original cost the Commission deducted $11,-813,362 from the Company's claim. The City's argument that this was insufficient raises a factual and not a legal issue. The Commission was not obliged to require or make a new original cost study, and we can ascertain no abuse of discretion upon the part of the Commission in accepting original cost determinations in prior proceedings as a basis for additions and adjustments.

FUNCTIONAL OBSOLESCENCE—REPRODUCTION COST: Consideration of the extent of functional obsolescence, which is necessarily a material factor in the ultimate determination of fair value of the Company's system, was likewise for the Commission. See *Pittsburgh v. Pennsylvania Public Utility Commission*, 165 Pa. Superior Ct. 519, 527, 69 A. 2d 844; *Pittsburgh v. Pennsylvania Public Utility Commission*, 174 Pa. Superior Ct. 224, 232, 101 A. 2d 127. We made refer-

ence in our opinion (*Philadelphia v. Pennsylvania Public Utility Commission*, 173 Pa. Superior Ct. 38, 52, 95 A. 2d 244) to certain factors to be considered in relation to obsolescence of a street transportation system. The Commission accordingly reviewed the question of functional obsolescence, and gave consideration to reproduction cost in determining fair value. However, it is apparent that the Commission in fixing fair value at $75,000,000 did not give controlling or even considerable weight to reproduction cost. The Commission obviously made allowance for obsolescence of the Company's system, although possibly not to the permissible extent. In this we think the Commission has complied substantially with our previous order.

MARKET VALUE OF SECURITIES: We also directed the Commission, in our previous order, to consider market value of securities as, under our law, that was established as one of the measures or factors, if made a part of the record, entering into a determination of fair value. *Philadelphia v. Pennsylvania Public Utility Commission*, supra, 173 Pa. Superior Ct. 38, 54, 55, 95 A. 2d 244. We have made it clear that the weight to be given to it, as to any other measure of value, necessarily varies according to the circumstances. In such matters the Commission has the duty to exercise its sound discretion on the facts before it. Although it may not be a primary measure of value, it has some significance and is relevant for the Commission's consideration until a change has been made in the Public Utility Law by the Legislature. In compliance with our order the Commission expressly gave recognition to market value of securities.

ACCRUED DEPRECIATION: It is recognized that accrued depreciation is essentially a judgment figure. *Pittsburgh v. Pennsylvania Public Utility Commission*, 174 Pa. Superior Ct. 4, 8, 9, 98 A. 2d 249;

*Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 168 Pa. Superior Ct. 95, 108, 78 A. 2d 35; *Blue Mountain Telephone & Telegraph Co. v. Pennsylvania Public Utility Commission,* 165 Pa. Superior Ct. 320, 326, 67 A. 2d 441. The Commission found accrued depreciation of $53,113,000 applicable to an original cost finding of $109,171,040.[1] The Company claimed for this item the sum of $43,187,364; and the City contended that the accrued depreciation on original cost should be $63,648,955, consisting of the Commission's 1941 finding of $47,000,000 plus net additions to book reserve of $16,648,955. See *Philadelphia Transportation Co. v. Pennsylvania Public Utility Commission,* 155 Pa. Superior Ct. 9, 25, 37 A. 2d 138. The Commission rejected the claim of the Company that its book reserve reflected the proper accrued depreciation, and was critical of a recent age-life depreciation study submitted by the Company. The City takes the position that, in the absence of a proper accrued depreciation study, there is nothing in the record to support the Commission's finding on accrued depreciation applicable to original cost. The Commission arrived at 52 per cent for depreciation applicable to original cost (less land) by taking the book reserve at December 31, 1952, of $39,717,549, and by adding thereto a deficiency of $6,386,800, making a total accrued depreciation as of December 31, 1952, of $46,104,349, exclusive of track. In recomputing the track depreciation the Commission, by using the Company's ages, lives, and salvage properly reflected, found a reserve requirement of $9,279,779 and an annual accrual of $601,228. The final figure, therefore, was ap-

---

[1] In the 1952 rate case the Commission found an accrued depreciation of $53,000,000 applicable to total original cost of $121,679,017.

proximately 52 per cent of book cost of plant, less land, franchise paving, work in progress, acquisition adjustments, and cost of financing.

The Commission used the depreciation factor of 56 per cent for reproduction cost. This percentage apparently was based upon the finding of original cost, a study of the trended reproduction cost components, and a study of price indices data of record. See *City of Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 171 Pa. Superior Ct. 187, 206, 90 A. 2d 607. There is substantial evidence in the record to support the Commission's accrued depreciation findings.

REVENUES, EXPENSES AND NET INCOME: The Commission in the present proceeding based its findings as to revenues and expenses on the base year ending December 31, 1952, or upon the most recent actual experience figures available. In 1952 the Company's net income before interest and income taxes was $2,377,876, including non-rate case items. For the base year operating revenues were $71,050,552 and total operating expenses were $68,672,676. The Commission accepted the Company's estimate of passenger revenues at the December 31, 1952 tariff rates in the amount of $73,800,000 for the calendar year 1953, an increase of $4,162,292 over the passenger revenues collected in 1952. The Commission found that the proposed tariffs of February 11, 1953, would yield additional revenues of $3,386,000 which added to the base year receipts, as adjusted, of $73,800,000 would produce passenger revenues of $77,156,700, after adjustment for route abandonments of $29,300. With other revenues of $1,416,932 the total annual adjusted operating revenues would be $78,573,632. The Commission thereupon found that the annual net income available for return from the proposed tariffs of February 11, 1953,

would be $3,967,620,[2] which is less than 6½ per cent on the fair value finding of $75,000,000. This result

---

[2] The Commission in its brief has submitted the following reconciliation of its finding:

| | | |
|---|---:|---:|
| Actual net income—1952 | | $ 2,378,000 |
| Increased revenue from 12-31-52 tariffs | | 5,033,000 |
| Increased revenues from proposed tariffs | | 3,386,000 |
| Total—before adjustments | | 10,797,000 |
| Adjustments per Commission Order of 12-8-53 | | |
| Revenue adjustments: | | |
| Decrease in riding levels: | | |
| Amount claimed above from 12-31-52 tariffs for base year ended 7-31-53 | $5,033,000 | |
| Amount used by Commission for base year ended 12-31-52 | 4,162,000 | |
| | 871,000 | |
| Decrease due to route abandonments | 29,000 | (900,000) |
| Increase in other operating revenues | | 4,000 |
| | | 9,901,000 |
| Expense adjustments: | | |
| Increase in expenses: | | |
| Additional wage costs—1952 labor contract | 375,000 | |
| Additional wage costs—1953 labor contract | 3,063,000 | |
| Additional wage costs—1954 labor contract | 1,458,000 | |
| Increased cost of supplies, tires, gasoline, etc. | 242,000 | |
| Increased pension costs | 82,000 | |
| Locust St. subway expense | 177,000 | |
| 5-year average snow-ice removal | 176,000 | |
| Additional track renewal expense 12-mile avg. | 382,000 | |
| Additional depreciation allowed (track) | 379,000 | |

follows from the deduction of total operating expenses
of $74,606,012 from the total operating revenues. The
operating expenses include taxes and an annual al-
lowance for depreciation of $2,788,398. In arriving
at the above estimates the Commission accepted the
evidence presented by the Company showing an esti-
mated downward trend in riding levels generally, as
well as evidence showing a reduction in passenger traf-
fic at a fixed ratio due to the resistance to the pro-
posed increase in rates.

| | | |
|---|---|---|
| Printing commutation tickets | 141,000 | |
| "Emergency measures" restored | 365,000 | |
| Difference in days 1952-1953 | 48,000 | |
| **Total** | **6,888,000** | |
| Decreases in expenses: | | |
| Extension of one-man car operation (1952) | 184,000 | |
| Adjustments for 1953 riding levels | 360,000 | |
| Miscellaneous economies | 240,000 | |
| Charitable contributions | 30,000 | |
| Injuries & damages disallowed | 50,000 | |
| Executive salaries saved | 25,000 | |
| Route abandonments | 172,000 | |
| Gross receipts tax—no longer paid | 136,000 | |
| Miscellaneous adjustments | 28,000 | |
| Printing, general & miscellaneous expense | 26,000 | |
| Decrease in operating taxes | 59,000 | |
| Decrease in rentals | 43,000 | |
| **Total** | **1,353,000** | |
| Total net increases | 5,535,000 | |
| Non-operating income & expenses disallowed | 400,000 | |
| Total net decreases to net income | | 5,935,000 |
| **Adjusted net income** | | **$ 3,966,000** |

*Adjustments.* The City has devoted much of its argument to adjustments which have been made by the Commission or which the Commission allegedly failed to make. We shall not analyze in this opinion all the differences of the City with the Commission or reproduce all of the respective computations, as we are satisfied from the record that any error which may be imputed to the adjustments is not sufficiently great to change the ultimate result. The City in its approach argues that to the actual net income of $2,377,876 for 1952 there should be added the estimated increased revenues of $5,033,000 (Com.—$5,033,600) for a pro forma year under the 15 cent fares, plus $3,386,000 under the proposed 18 cent fares, or a total of $10,796,876 net operating income available to the Company. While the City concedes that this income figure must be adjusted for known increased labor costs through 1954, it disputes many of the other adjustments necessary to correlate net income figures for prior pro forma years to the Commission's estimate of net annual income of $3,967,620 under the tariffs of February 29, 1953. If the Commission had rejected many of the items of expense and revenue upon which the Company relied and had accepted the contentions of the City, it is possible the rates under the proposed tariffs might have been found to be unreasonable. The essential evidence was in the record, and, while some of the evidence was not as clear as might be desired, it was substantial. The issues were to be determined upon the credibility and the weight to be given the evidence adduced.

We shall limit specific reference to a few of the items.

*Annual Depreciation—Track Allowance.* The Commission's allowance for annual depreciation was $2,788,389. The City contends that this is excessive. In

the 1952 rate case the Company claimed $2,356,697 for annual depreciation on all property including track; this was based on age-life concept for property other than track. The Commission has allowed annual depreciation as claimed by the Company in the amount of $2,187,161, exclusive of track. The Commission treated the track properties as depreciable and therefore increased the annual provision for depreciation.[3] The Commission having disallowed $369,811 of track renewal expense, the Company's operating expenses were increased by only $86,917. As previously indicated there was in the record a depreciation study based on straight line age-life method introduced by the Company which the Commission rejected. However, there was substantial evidence in the record of accrued depreciation of the Company's property, including a bring-down of previous depreciation studies. It is not improper for the Commission to compute accrued and annual depreciation on similar bases as allowances for annual depreciation should be reasonably consistent with allowances for accrued depreciation. *Schuylkill Valley Lines, Inc., v. Pennsylvania Public Utility Commission*, 165 Pa. Superior Ct. 393, 402, 68 A. 2d 448. The City argues that an allowance for track depreciation plus allowances for track renewals permit the Company to have a double recovery for its track cost. There is apparently no double recovery as these

[3] Present Accrual     $2,331,661

Less:

Present Provision for Track Abandonment     144,500

Total     $2,187,161

Add:

Provision for Track Depreciation     601,228

Total     $2,788,389

items relate to distinct property and, as applied by the Commission, were for distinct purposes. The allowances are not shown to be improper, and the Commission's disposition of annual depreciation is supported by the record except to a negligible extent.

*Snow and Ice Removal Expense.* There is also no ground for the complaint of the City relative to allowance for snow and ice removal. The allowance was computed on the basis of a five-year average of such cost, as adjusted for current cost of labor and material. This, like the other adjustments, was within the discretionary power of the Commission to make.

*Increased Labor Costs.* There seems to be no difference of opinion as to the material effect of increased labor costs in the amount of $4,538,000 through 1954 on the Company's operating expenses.

*Coin Boxes.* The City again questions the failure of the Company to use coin boxes in the collection of fares. The installation of coin boxes is, in the first instance, for the Company to determine, and secondly for the Commission to consider whether the failure to do so constitutes an abuse of managerial discretion.

JURISDICTION — THE CITY-COMPANY AGREEMENT OF 1907: The City attempts to reargue the question of the jurisdiction of the Commission over City-owned high speed lines and facilities leased to the Company, and the City's right under the 1907 lease agreement to require its consent to fare increases. We think our ruling on these two matters in the prior appeals sufficiently disposes of the issues raised, and we shall not review them again. See *Philadelphia v. Pennsylvania Public Utility Commission,* supra, 173 Pa. Superior Ct. 38, 43-47, 95 A. 2d 244.[4]

---

[4] Allocatur refused by the Supreme Court of Pennsylvania on April 18, 1953.

REVIEW: Principles applicable to this rate case have been recognized previously. In *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 168 Pa. Superior Ct. 95, 106, 78 A. 2d 35, 40, we said: "In forecasting probable future revenues under a given tariff, the Commission must necessarily have the power to exercise its own judgment 'upon a view of all the relevant circumstances.'" And, again, in *City of Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 171 Pa. Superior Ct. 187, 210, 90 A. 2d 607, 618, we said: "The Commission is given discretionary power to make necessary adjustments to all estimates. But the adjustments must be based on evidence, and cannot be unfairly weighted in favor of either the utility or the consumer."

We may not be unmindful that rate-making is an exercise of the legislative power, and necessarily implies a range of legislative discretion. This function has been delegated by the Legislature to the Commission which, as an administrative body equipped with a staff of investigators, accountants, engineers, and experts, is peculiarly fitted for the task. Consequently, if not confiscatory, the reasonableness of rates is an administrative question for the Commission, and the Commission's findings, if supported by the evidence, may not be disturbed by us. *Sheets v. Pennsylvania Public Utility Commission,* 171 Pa. Superior Ct. 151, 155, 90 A. 2d 633.

This rate case has been exhaustively contested. Weaknesses in the Company's evidence have been noted by the Commission. Counsel for the City has disclosed contradictions and inconsistencies. The Commission in its order has analyzed the massive record, and made its findings of fact. We think the Commission is fully aware of its duty to require this utility to provide adequate service at reasonable rates. There may be differ-

ences of opinion as to what extent this has been accomplished. But we find no error of law or lack of evidence requiring a reversal of the Commission's order. No question of confiscation is involved nor is any violation of constitutional rights of the City established, and consequently our power to interfere with the order of the Commission is limited to errors of law or lack of evidence to support the Commission's findings. *Pittsburgh v. Pennsylvania Public Utility Commisson,* supra, 168 Pa. Superior Ct. 95, 106, 78 A. 2d 35; *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 174 Pa. Superior Ct. 224, 230, 101 A. 2d 127.

We have affirmed on January 19, 1954, the order of the Commission of December 8, 1953.