Duquesne Light Company, Appellant, *v.* Pennsylvania Public Utility Commission.

Argued April 21, 1954. Before RHODES, P. J., HIRT, ROSS, GUNTHER, WRIGHT, WOODSIDE and ERVIN, JJ.

*Thomas J. Munsch, Jr.* and *Charles E. Kenworthey,* with them *Henry G. Wasson, Jr., David Dunlap* and *Reed, Smith, Shaw & McClay,* for Duquesne Light Co.

*J. Frank McKenna, Jr.,* City Solicitor, with him *David Stahl,* Assistant City Solicitor, for City of Pittsburgh.

*W. Russell Hoerner,* Assistant Counsel, with him *Lloyd S. Benjamin,* Counsel, for Public Utility Commission.

*Robert L. Orr,* with him *Harold R. Reed* and *Reed, Ewing & Ray,* for intervenor, appellee.

OPINION BY WRIGHT, J., August 30, 1954:

These appeals mark the third time in recent years that proposed rate increases sought by the Duquesne Light Company (hereinafter called Duquesne) have been before this Court. The litigation had its beginning on February 6, 1950, when Duquesne filed with the Pennsylvania Public Utility Commission (hereinafter called Commission) Tariff No. 10 superseding Tariff No. 9, and providing for increases in rates to become effective April 10, 1950, and designed to produce additional annual revenue of $7,720,612. Complaints were filed against the proposed tariff and hearings were held by the Commission. By its order of August 29, 1951, the Commission disallowed the full increase proposed, and allowed instead an increase of $3,556,924. The Commission found annual operating revenues to be $60,574,238 based upon the 1949 level of operations, and allowed a rate of return of 6 percent or $12,900,000 on a fair value of $215,000,000. On appeal to this Court the order was (July 17, 1952) reversed and the case remanded to the Commission. See *City of Pittsburgh v. Pa. P. U. C.,* 171 Pa. Superior Ct. 187, 90 A. 2d 607. Following this decision, the Commission held further hearings as a result of which it issued its order of March 9, 1953. This order reduced the rate base from $215,000,000 to $208,-000,000 and the allowable return from $12,900,000 to $12,080,000. Annual operating revenues were reduced from $60,574,238 to $59,921,499. The Commission did

not, however, reduce the rate increase which it had originally allowed. The City of Pittsburgh (hereinafter called City) and Duquesne both appealed this order and this Court (August 28, 1953) affirmed the Commission. See *Duquesne Light Co. v. Pa. P. U. C.*, 174 Pa. Superior Ct. 62, 99 A. 2d 61. The new rates were embodied in Tariff No. 11.

Meanwhile, on December 11, 1952, Duquesne had filed with the Commission its Tariff No. 12, proposing new rates resulting in a total increase in gross revenues of $4,732,022 to become effective March 1, 1953. The effective date of Tariff No. 12 was suspended by the Commission for a total period of nine months to December 1, 1953. By an order dated November 23, 1953, the Commission prescribed Tariff No. 11 as temporary rates to be in force until the final disposition of the proceedings involving Tariff No. 12. Complaints were filed by the City and by the St. Joseph Lead Company (hereinafter called St. Joseph). There were eighteen days of hearings with a considerable amount of testimony and numerous exhibits.[1] On December 22, 1953, the Commission issued an order finding the proposed rates of Tariff No. 12 to be unjust and unreasonable. The fair value of the utility's property was found to be $297,000,000 upon which the Commission allowed a return of 6 percent or $17,820,000. The Commission also found that the allowable annual operating revenues should be $77,518,493 or $1,811,000 less than the annual revenues under the prior rates. The entire reduction was allocated to industrial consumers.

On January 11, 1954, Duquesne appealed from the order of December 22, 1953, to Nos. 78, 79, and 80

---

[1] The record before us consists of six volumes, four of testimony and two of exhibits, with a consolidated index separately printed. The briefs of counsel contain approximately 300 pages.

April Term, 1954. On January 18, 1954, St. Joseph was permitted to intervene as a party appellee at Nos. 78 and 80 April Term, 1954, and the City was permitted to intervene as a party appellee at Nos. 78, 79, and 80 April Term, 1954. On January 21, 1954, the City appealed from the order of December 22, 1953, at No. 88 April Term, 1954. On February 11, 1954, Duquesne was permitted to intervene as a party appellee at No. 88 April Term, 1954. On petition of Duquesne we directed that its appeal should operate as a supersedeas on condition, however, that it should not have the right, in the event it was successful on appeal, to amortize or recover the deficiency between the temporary rates which went into effect prior to the date of the Commission's final order and any increased rates which might be allowed by this court or by the Commission after remand.

## Preliminary Considerations

*Commission Procedure.* Duquesne contends that the Commission was in error "in reducing allowable revenues under existing rates where no complaint was filed against such revenues and the Commission did not institute any proceeding against them". It is the position of Duquesne that the only issue before the Commission was the reasonableness of the proposed *increase* in revenues set forth in Tariff No. 12, and that, so far as the present proceeding is concerned, the Commission could not provide for any revenues below the levels established by Tariff No. 11. Duquesne relies upon §309 of the Public Utility Law, Act of May 28, 1937, P. L. 1053, as amended, 66 PS §1149, which provides that the Commission shall not impose a reduction in existing rates except "after reasonable notice and hearing". Its position is that, since there was no complaint against, or investigation initiated concerning, existing rates, and no notice in connection

therewith, the Commission had no power to reduce revenues under existing rates. We are not in agreement with this contention.

Section 309 concerns the fixing of rates by the Commission upon its own motion or upon complaint. It is §308 (66 PS §1148) which sets forth the procedure to be followed in cases where a utility has filed new tariffs proposing voluntary changes in rates. Duquesne initiated the present proceedings by filing Tariff No. 12. Paragraph (c) of §308 provides in such event: "If, after such hearing, the commission finds any such rate to be unjust or unreasonable, or in anywise in violation of law, the commission shall determine the just and reasonable rate to be charged or applied by the public utility for the service in question, and shall fix the same by order to be served upon the public utility; and such rate shall thereafter be observed until changed as provided by this act". There is thus imposed upon the Commission the duty of prescribing just and reasonable rates, and it is necessarily implied that such rates may be either higher or lower than the existing rates which the utility voluntarily seeks to change.

Duquesne cites *West Penn Power Co. v. Pa. P. U. C.*, 174 Pa. Superior Ct. 123, 100 A. 2d 110, but that case is not controlling. We there held that the Commission, having made a conclusive affirmative order, thereafter had no authority without notice and hearing to reverse such action and enter a different order. Nor does *Armour Transportation Co. v. Pa. P. U. C.*, 138 Pa. Superior Ct. 243, 10 A. 2d 86, also cited, support Duquesne's position. We there said: "The question of what is proper notice, or, as here, of what constitutes a specific designation of the issue raised or charges made, depends necessarily upon the facts of each case, the type of investigation being conducted, the viola-

tions alleged, and the penalty or order sought to be imposed. Where the purpose of the investigation by the Commission is only to determine the reasonableness of rates charged by a utility, a different standard would seem to apply than where the franchise of the utility is sought to be revoked for violation of the utility laws and a penalty or fine imposed". As provided by §308, the Commission acted upon the evidence submitted by Duquesne in support of its proposed rates schedule under Tariff No. 12. If such evidence fell short of justifying the revenues under rates previously established by Tariff No. 11, it was not necessary for the Commission to abandon the proceeding. While Tariff No. 11 and Tariff No. 12 involved two separate rate schedules, the findings previously made in the proceeding upon Tariff No. 11 were not conclusive for the future. Orders fixing rates are not res judicata: *Philadelphia v. Pa. P. U. C.,* 173 Pa. Superior Ct. 38, 95 A. 2d 244. We have concluded that the action of the Commission, if otherwise correct, was entirely within the broad powers committed to it by the Public Utility Law. See *Latrobe Bus Service v. Pa. P. U. C.,* 175 Pa. Superior Ct. 164, 103 A. 2d 442.

*Court Function.* In the words of Judge HEAD in the early case of *Baltimore & Ohio R. R. Co. v. Public Service Commission,* 66 Pa. Superior Ct. 403: "Establishing a schedule of the rates or tolls that a public service company may lawfully demand is one of the most complicated and important of all of the many important tasks imposed by the legislature on the Public Service Commission. The proper determination of such questions necessarily involves the consideration of many matters and things far removed from the atmosphere of an appellate court of law". The ascertainment of fair value for rate making purposes "is not a matter of formulas, but it is a matter which calls

for the exercise of a sound and reasonable judgment upon a proper consideration of all relevant facts . . . Much must be left to the sound discretion of the appraising body, the tribunal appointed by law and informed by experience, for the discharge of these delicate and complex duties": *Ben Avon Boro. v. Ohio Valley Water Co.*, 260 Pa. 289, 103 A. 744. The classification and reasonableness of rates is an administrative question for the Commission: *Sheets v. Pa. P. U. C.*, 171 Pa. Superior Ct. 151, 90 A. 2d 633. As pointed out by Judge CUNNINGHAM in *Boland v. Public Service Commission and Abington Electric Co.*, 101 Pa. Superior Ct. 102, we are not a second administrative tribunal. And see *Pittsburgh v. Pa. P. U. C.*, 174 Pa. Superior Ct. 363, 101 A. 2d 761.

In enacting the present Public Utility Law the legislature provided: "The order of the commission shall not be vacated or set aside, either in whole or in part, except for error of law or lack of evidence to support the finding, determination, or order of the commission, or violation of constitutional rights". Act of May 28, 1937, P. L. 1053, §1107, as amended, 66 PS 1437. See *Pittsburgh v. Pa. P. U. C.*, 158 Pa. Superior Ct. 229, 44 A. 2d 614. It is further provided in §1112 of the Act (66 PS 1442): "Whenever the commission shall make any rule, regulation, finding, determination, or order under the provisions of this act, the same shall be prima facie evidence of the facts found". See *Pennsylvania R. R. Co. v. Pa. P. U. C.*, 154 Pa. Superior Ct. 86, 35 A. 2d 558. It is only where the utility appeals on the ground of confiscation that we may make independent findings. Otherwise we are bound by the findings made by the Commission if there is evidence to support them, and if they support the Commission's order. See *Schuylkill Valley Lines, Inc. v. Pa. P. U. C.*, 165 Pa. Superior Ct. 393, 68 A. 2d 448,

and *Pittsburgh v. Pa. P. U. C.*, 169 Pa. Superior Ct. 400, 82 A. 2d 515. With the foregoing restatement as a guide, we will proceed to consider the several arguments advanced by the respective appellants as a basis for their attack upon the merits of the order of the Commission.

### Fair Value

*Trended Cost.* The City contends that the Commission should have rejected the evidence of trended original cost presented by Duquesne as measures of value. This evidence showed, inter alia, the original cost of Duquesne's property trended to the cut-off date of December 31, 1952, and to three-year, five-year, and ten-year average price levels. In determining these trended prices, fifteen of ninety-one plant accounts were trended by the use of factors developed from Duquesne's own experienced unit costs. The remaining accounts were trended by the use of various published index numbers from which trending factors were derived. The Commission found that the fifteen accounts were the only ones for which Duquesne's experience costs were available. They had been considered reliable in the prior rate case and were so considered in this proceeding. By use of factors reflecting Duquesne's own experienced costs, the original cost trended so far as these fifteen accounts were concerned, amounted to $118,419,399. By using published Handy-Whitman index numbers, the trended original cost of these same fifteen plant accounts amounted to $95,692,331. The City's objection to the use of trend factors developed by Dusquesne is that they are unreliable since they do not take into account differences in quality of units of property installed in different years. There can be no question that any trended original cost study will contain certain inherent errors or inconsistencies arising out of changes in the nature of property, and the

Commission does not take the position that the figures developed by the use of Duquesne's factors have an accurate mathematical certainty. Its position is that any trended original cost study is merely an estimate of the translation of past costs into terms of present-day values; and is merely a guide to enable the Commission, in the exercise of its judgment on all the evidence, to ascertain the fair value. Furthermore, the Commission was of the opinion that Duquesne's figures based on its own experience were preferable to the hypothetical indicies representing general experience, since they more accurately reflected the exact conditions which Duquesne has had to face. As was said in *Solar Electric Co. v. Pa. P. U. C.*, 137 Pa. Superior Ct. 325, 9 A. 2d 447: "We also agree with the assumption of the commission that where the actual experience of a particular utility is available and the rates of that utility are being examined, such information is of great value".

The City also argues that Duquesne admittedly included in trended cost measures of value items which had previously been charged to expense. These items were amounts representing purchasing and warehousing costs which, prior to 1931, had been charged to expense. The Commission found that seven accounts included such costs and, accordingly, adjusted the various price levels by amounts to correct this error. This was in accord with our decision in *Philadelphia v. Pa. P. U. C.*, 173 Pa. Superior Ct. 38, 95 A. 2d 244, wherein we pointed out that amounts charged to operating expense cannot be capitalized and included in the rate base. Essentially, it would appear that the question involved here is one of the weight to be given the trended cost evidence. Such evidence is merely a guide in the determination of fair value. It cannot be seriously contended that even under the best of conditions it is

free from error, and the fact that it does contain defects would not justify the Commission in rejecting it. So long as the evidence is reasonably accurate, the weight to be given it is a matter for the Commission: *Equitable Gas Co. v. Pa. P. U. C.*, 160 Pa. Superior Ct. 458, 51 A. 2d 497; *Pittsburgh v. Pa. P. U. C.*, 171 Pa. Superior Ct. 187, 90 A. 2d 607.

*Accrued Depreciation.* The Commission found that the accrued depreciation applicable to original cost of Duquesne's property on the cut-off date of December 31, 1952, amounted to 26.5 percent, that the accrued depreciation applicable to trended original cost amounted to 34.5 percent, and that the accrued depreciation applicable to reproduction cost amounted to 34 percent. Both Duquesne and the City object to these findings. Duquesne contends that they are too high while the City asserts that they are too low.

The Commission had before it the following: a reserve requirement study by the City, a reserve requirement study by Duquesne, the finding of the Commission in the prior rate proceeding, and the book reserve. The Commission did not consider the book reserve controlling since it had not been accumulated on actual service life but from percentages of revenues and by lump sum appropriations from surplus. Duquesne's witnesses stated that the company's records were not adequate to enable it to prepare a reserve requirement study based on its own experience, and based the study presented upon the retirement experience of utilities in the State of New York. In the words of the Commission: "We quite agree that failing a utility's own retirement experience, the second best measure would be the retirement experience of other comparable utilities". The City contends that the estimated amount of accrued depreciation applicable to original cost based on Duquesne's requirement study should have

been adjusted upward by the Commission in the amount of $11,786,063. Its position is in effect that the Commission should have given less weight to Duquesne's study and more weight to the study presented by the City, which was based primarily on five of the fourteen utilities included in Duquesne's study. Which of the two studies it should accept as a guide was clearly a matter for the exercise of judgment and discretion by the Commission: *Pittsburgh v. Pa. P. U. C.*, 171 Pa. Superior Ct. 187, 90 A. 2d 607. We have consistently held that accrued depreciation is essentially a judgment figure,[2] and that the exact weight to be given to any particular estimate is for the Commission to determine: *Pittsburgh v. Pa. P. U. C.*, 174 Pa. Superior Ct. 363, 101 A. 2d 761.

Duquesne's contention that the percentage figures are too high is based on a comparison of the percentages of accrued depreciation determined by the Commission in the order made on Tariff No. 11, and the percentages developed in the present proceeding. In so doing, Duquesne is attempting to treat the findings in the prior proceeding as res judicata. This it cannot do. See *Philadelphia v. Pa. P. U. C.*, 162 Pa. Superior Ct. 425, 57 A. 2d 613. The prior findings were based on a record developed in a different proceeding at a previous time. They were worthy of consideration by the Commission in the present case, but they can in no sense be considered as binding: *Pittsburgh v. Pa. P. U. C.*, 174 Pa. Superior Ct. 4, 98 A. 2d 249. Duquesne also argues that the spread of eight points between the percentage of accrued depreciation appli-

---

[2] *Schuylkill Valley Lines, Inc. v. Pa. P. U. C.*, 165 Pa. Superior Ct. 393, 68 A. 2d 448; *Pittsburgh v. Pa. P. U. C.*, 168 Pa. Superior Ct. 95, 78 A. 2d 35; *Orlosky v. Pa. P. U. C.*, 171 Pa. Superior Ct. 409, 89 A. 2d 903; *Philadelphia v. Pa. P. U. C.*, 174 Pa. Superior Ct. 641, 102 A. 2d 428.

cable to original cost and the percentage applicable to trended original cost is inconsistent in view of the spread in the findings in the *Bell Telephone Company* case. See *Pittsburgh v. Pa. P. U. C.,* 174 Pa. Superior Ct. 4, 98 A. 2d 249. This argument is rather tenuous in view of the fact that the figures in Duquesne's own reserve requirement study showed a spread of 7.46 percent. However, it is sufficient answer to the contention to point out that the two proceedings involved different factual situations.

The duty of the Commission was to determine according to its best judgment the accrued depreciation from all the evidence presented: *Blue Mountain Telephone & Telegraph Co. v. Pa. P. U. C.,* 165 Pa. Superior Ct. 320, 67 A. 2d 441; *Orlosky v. Pa. P. U. C.,* 171 Pa. Superior Ct. 409, 89 A. 2d 903. Since the record contained sufficient probative evidence upon which the Commission could arrive at a percentage of accrued depreciation, its finding in this regard was not an abuse of administrative discretion, see *Equitable Gas Co. v. Pa. P. U. C.,* 174 Pa. Superior Ct. 450, 102 A. 2d 235, and our conclusion is that it should not be disturbed: *Pittsburgh v. Pa. P. U. C.,* 168 Pa. Superior Ct. 95, 78 A. 2d 35.

*Investment in Elrama No. 2.* On January 18, 1953, Duquesne placed in operation a generating plant, known as Elrama No. 2. This was after the cut-off date of December 31, 1952. However, since the first hearing did not take place until March 11, 1953, the Commission could properly take into consideration the construction costs of the plant and the expense savings which Duquesne expected as a result of more efficent operation. The Commission may not ignore recent information and evidence in the record which substantially affects the problem before it. See *Pittsburgh v. Pa. P. U. C.,* 171 Pa. Superior Ct. 187, 90 A. 2d 607.

It was estimated that if Elrama No. 2 had been in operation throughout the year 1952, the operating expenses would have been reduced by $3,000,000. This amount was deducted from expenses by the Commission, and no question is raised concerning its order in this connection. However, Duquesne claims that the construction of Elrama No. 2 is but one step in a building program involving a total expenditure of $27,951,000. The Commission included in the rate base a rounded figure of $14,500,000 representing the construction costs of Elrama No. 2. Duquesne contends that the Commission erred in refusing to include the total amount, asserting that $14,500,000 was simply the cost of the generating unit and a fraction of the transmission system. It argues that $27,951,000 is "the amount which is required for the operation of the Elrama No. 2 generator". The basis of this argument is the testimony of the head of the Company's Planning Department that that figure was an "estimate of the amount of plant that should have been in service during 1952 to carry the loads actually on the lines in that year with a reasonable amount of reserve".

It is apparent that the amount sought by Duquesne represents the total cost of proposed expansion and, on the basis of the quoted testimony, expansion which Duquesne felt should have been made earlier. The fact is however that, of this proposed expansion, only one portion (Elrama No. 2) had been completed and was in service. Duquesne concedes that "The Commission has allowed $14,500,000 which is substantially the amount required to be spent for the generator unit alone, with immediately related transmission facilities". The Commission found that the remaining items making up the balance of $13,500,000 were proposed improvements to be made at some unascertained date, not related or essential to either the construction

or operation of Elrama No. 2. Under §311 of the Public Utility Law (66 PS §1151) only the property used and useful in the public service may be considered in fixing fair value. The Commission properly rejected those items which will not come into existence until some unascertained future time: *Schuylkill Valley Lines v. Pa. P. U. C.*, 165 Pa. Superior Ct. 393, 68 A. 2d 448.

*Materials and Supplies.* The City objects to the allowance of $9,250,000 comprising $5,500,000 for materials and supplies and $3,750,000 for coal inventory. There was no claim made by Duquesne for cash working capital, and the Commission made no allowance in this connection, which is in accord with the ruling of this court and the Pennsylvania Supreme Court in *Pittsburgh v. Pa. P. U. C.*, 169 Pa. Superior Ct. 400, 82 A. 2d 515, 370 Pa. 305, 88 A. 2d 59. We are not in agreement with the City's contention that there is no distinction between a cash working capital allowance and an allowance for material and supplies. In the words of Judge Hirt in *Pittsburgh v. Pa. P. U. C.*, 174 Pa. Superior Ct. 363, 101 A. 2d 761: "The same principles which called for a denial of an allowance for cash working capital, cf. City of Pittsburgh v. Pennsylvania Public Utility Commission, 370 Pa. 305, 309-312, did not necessarily prohibit a capital allowance for materials and supplies". While tax accruals may properly be used to eliminate a hypothetical cash working capital allowance, the same principle does not apply to materials and supplies, which represent inventories of tangible property owned by the utility and required in rendering service. Our conclusion is that an allowance for materials and supplies was entirely proper. The amount of that allowance was for the judgment of the Commission. See *Pittsburgh v. Pa. P. U. C.*, 174 Pa. Superior Ct. 363, 101 A. 2d 761.

Annual Revenue

*Projected Revenues.* In order to determine the projected revenues for the future it was necessary for the Commission to adjust the operating revenues and expenses of the test year so as to eliminate the effect of a strike in the steel industry, and also to annualize revenues received from, and expenses incurred in serving, customers during the test year. The Commission adopted the City's study relative to the effect of the steel strike. Briefly, the computation to counteract the effect of the strike was measured by the difference between what the revenues would have been had the trend prior to May, 1952, been continued up to August, and by projecting the trend after August, 1952, back to May. The difference between these overlapping values was $1,902,000. No question is raised on this appeal challenging the Commission's acceptance of this evidence. The City contends however, that there was error in rejecting the results of its study for annualization of operating revenues and expenses and in accepting Duquesne's annualization study.

The City's study was based on a mathematical projection on a total system basis, which did not distinguish between residential and industrial use. The Commission found that residential sales exert slight weight in the tabulations of total sales, and that the City's calculations so weighted were unacceptable. Duquesne's study was based on an analysis of the number of new customers added in the residential, small commercial and small industrial classes, with the amount of kilowatt hours used by each. From this was determined the amount which would have been consumed had they been customers throughout the entire year. In the case of large industrial and commercial users the number of new contracts and the changes in old contracts were analyzed and the estimated additional

use was projected for the entire year, as if they had had such contracts for that period. Similar treatment was applied to the cost of producing the additional energy consumed. With the two studies to choose between, it was incumbent upon the Commission to determine which one represented the better adjustment. It has the power to exercise its own judgment in forecasting probable future revenue: *Orlosky v. Pa. P. U. C.*, 171 Pa. Superior Ct. 409, 89 A. 2d 903. The Commission in its order stated that "load growth adjustments of commercial and industrial sales based factual detailed studies are far better than the assumed 'law of averages' calculations applied to all classes of sales by City". It was not error for the Commission to adopt the study which it felt was the more accurate.

*Excess Profits Tax.* By Act of Congress dated July 16, 1953, the federal excess profits tax expired on December 31, 1953, or nine days after the entry of the Commission's order of December 22, 1953. The order disallowed excess profits taxes. Duquesne objects on the ground that the tax was in existence during the entire base year of 1952. We recognize that, in practical application, the use of a test year and cut-off date in determining a rate case is not free from difficulty, since changes may become known before the order is entered. In strict theory perhaps, these subsequent developments should be ignored. However, this court has stated that the Commission "cannot be oblivious" to them: *Pittsburgh v. Pa. P. U. C.*, 171 Pa. Superior Ct. 187, 90 A. 2d 607. It must be kept in mind that rates are being fixed for the future, and the Commission, having "a wide area of discretion as to the extent and the type of adjustments to be made to base year figures": *Pittsburgh v. Pa. P. U. C.*, supra, 174 Pa. Superior Ct. 62, 99 A. 2d 61, could properly make

an adjustment to reflect the elimination of the excess profits tax.

On the other hand, Duquesne alleges that the Commission committed an injustice in disallowing the excess profits tax without taking cognizance of a wage increase which became effective October 1, 1953, over two and a half months before the order was made. We agree that an adjustment to reflect the elimination of the excess profits tax without a corresponding adjustment to reflect the wage increase is not only inconsistent but directly in conflict with the principle underlying our prior decisions. The wage increase "was called to the Commission's attention at the oral argument on November 10, 1953, and was actually in effect prior to the writing of the Commission's Order".[3] In *Pittsburgh v. Pa. P. U. C.,* supra, 171 Pa. Superior Ct. 187, 90 A. 2d 607, with regard to the repeal of the federal electric energy tax, we said, "As the record must be remitted for other reasons, the Commission should take into consideration this very material change in Duquesne's allowable tax expense". So in the case at bar, as the record must be remitted for another reason (as will hereinafter appear), the Commission should either make a corresponding adjustment for the wage increase, or adhere more strictly to the base year concept by not making either adjustment.

*Fuel Adjustment Clause.* A fuel adjustment clause is a method designed to enable a utility to adjust its revenues either upward or downward to reflect changing fuel costs without having to resort to the cumbersome procedure of filing new tariffs. Tariff No. 12 provided a fuel cost adjustment applicable to certain

---

[3] This statement in appellant's brief is not challenged.

commercial users[4] "at the rate of 0.0154 cents per kilo-watt-hour, for each one cent variation from 20 cents in the *cost per million B.T.U. of fuel* consumed at the Company's generating stations" (Italics supplied). A clause of this type was approved by the Commission in its prior orders, and by this court on appeal. See *Pittsburgh v. Pa. P. U. C.*, 171 Pa. Superior Ct. 187, 90 A. 2d 607; *Duquesne Light Co. v. Pa. P. U. C.*, 174 Pa. Superior Ct. 62, 99 A. 2d 61. In the present order, the Commission substituted a clause providing that "an adjustment up or down in cents per KWH will be made, equal to the increase or decrease in the average current *fuel cost per KWH,* above or below a fuel cost of 0.3111 cents per KWH" (Italics supplied). Under the clause proposed by Duquesne an adjustment would be made in the customer's bills to reflect changes in the cost per million BTU of fuel. For each one cent change in this cost, the adjustment is at a constant rate, 0.0154 cents per kilowatt-hour. Under the Commission's clause the adjustment will vary with the cost of fuel per KWH. The Commission's position is that the cost of fuel per KWH is affected not only by the cost of fuel per million BTU, but also by the amount of fuel consumed to produce a KWH, or, in other words, by the thermal efficiency of the system. It reasons that, if a fuel adjustment clause contains a fixed thermal efficiency factor, then any improvement in thermal efficiency would not be reflected in the adjustment of the basic charge. Consequently, a utility having a fuel cost adjustment clause with a fixed thermal efficiency factor would collect a relatively greater rate in the event of an improvement in thermal efficiency.

---

[4] In Rate "W" to that portion of the energy used per month in excess of 1,000 KWH, and in Rates "X" and "Y" to all energy billed.

The controversy is in effect between a fixed and a variable thermal efficiency factor.

Duquesne argues that the Commission's clause gives the rewards of efficiency to customers while the costs of efficiency must be borne by the company, and that a premium will thereby be placed on inefficient operation. The Commission answers that recovery of capital outlay should be by way of the demand charge, otherwise the Company will receive a double return. In *Magee Carpet Co. v. Pa. P. U. C.*, 174 Pa. Superior Ct. 438, 102 A. 2d 229, President Judge RHODES said: "The obvious and fundamental purpose of a fuel adjustment clause is to provide for the adjustment of charges for service to a consumer to directly reflect the changing fuel cost to the utility".

We must agree that "the changing fuel cost to the utility" is determined both by the change in cost of fuel per million BTU, and the change in the efficiency of converting fuel into electric energy. The operation of the clause, like most questions dealing with the refinements of rate structures, is primarily a factual matter for determination by the Commission: *Magee Carpet Co. v. Pa. P. U. C.*, 174 Pa. Superior Ct. 438, 102 A. 2d 229. The mere fact that the type of clause advocated by Duquesne formerly found approval does not preclude the Commission from changing it in the exercise of its functions as an administrative agency of the legislature: *Aizen v. Pa. P. U. C.*, 163 Pa. Superior Ct. 305, 60 A. 2d 443. Rate making is an exercise of the legislative power, delegated to the Commission, and necessarily implies a range of legislative discretion: *Philadelphia v. Pa. P. U. C.*, 174 Pa. Superior Ct. 641, 102 A. 2d 428.

*Annual Depreciation Allowance.* Duquesne complains that the order of the Commission is confiscatory in that the allowance for annual depreciation is not

sufficient to allow it to recover the full original cost of its depreciable plant amounting to $279,957,341. Duquesne's book reserve for depreciation is 24.5 percent or $68,736,193. It contends that it must have an annual allowance for depreciation of $6,602,187 in order to recover the cost in the remaining period of the life of the property as found by the Commission (about 29 years). Since the Commission allowed only $6,-190,187[5] as the annual depreciation recoverable, it is Duquesne's position that the difference between this amount and the amount which should have been allowed, or $412,000 a year, will result in the eventual confiscation of $12,000,000 of its property. Basically, Duquesne's position is founded on the "remainder-life" theory of depreciation. See *Clark's Ferry Bridge Co. v. P. S. C.*, 108 Pa. Superior Ct. 49, 165 A. 261; *Equitable Gas Co. v. Pa. P. U. C.*, 160 Pa. Superior Ct. 458, 51 A. 2d 497.

In its 1951 Order, the Commission allowed Duquesne the amount necessary to enable it to recover the full amount of the original cost of the property. The Commission, after pointing out that the annual accruals would produce an overall total of only $200,-817,528 said (29 Pa. P.U.C. 674, 758) : "This amount compares with $212,199,261 representing the original cost of depreciable and depletable plant and construction work in progress in service, as shown above in Table VI. So that respondent will be provided with this difference of $11,381,633, we will include in our finding of annual depreciation for the purposes of this proceeding, $443,555 which, over remaining useful service life, will accrue to that difference". Although

---

[5] This figure does not include $339,190 for annual depreciation on the portion of Elrama No. 2 which the Commission included in the rate base.

the additional allowance was attacked by the City, this Court affirmed, saying that "the Commission's allowance for annual depreciation was calculated to permit the utility to recover the original cost of its property": *Pittsburgh v. Pa. P. U. C.,* 171 Pa. Superior Ct. 187, 213, 90 A. 2d 607.

In the present order the Commission has held that there can be no increase in the annual depreciation charges to enable the Company to recover the deficiency in the reserve requirement. It now takes the position that it was in error in the previous case involving Duquesne. Briefly, the Commission contends that Duquesne did not prove that its deficiency in book reserve in the past resulted from lack of earnings. Furthermore, it takes the position that (1) it is a practical impossibility in most cases to make a determination of whether past earnings were adequate or inadequate, and (2) the past must be forgotten if rates are to be based on the present cost of service to the utility. The Commission relies on *Newport Home Water Co. v. P. S. C.,* 76 Pa. Superior Ct. 386, for the proposition that a utility may not amortize a deficiency in the book reserve for depreciation when that deficiency was caused by mistakes of the management in the past. An examination of the *Newport* case discloses irregularities on the part of the water company management amounting to deliberate misapplication of funds. In the present case, however, there is nothing to show that the Company was guilty of any faulty past practices in accumulating its book reserve, or that the conceded deficiency therein is not genuine. In fact, in 1937 the Commission expressly approved the Company's reserve for depreciation and its annual accruals: *P. U. C. v. Duquesne Light Co.,* 20 P.U.R. N.S. 1, 6. The subsequent accruals have been greater than the amount strictly required. In now changing its policy, the Com-

mission concedes that its allowance for annual depreciation will not reimburse Duquesne for the full original cost of its property.

We are of the opinion that the reasoning in *Pittsburgh v. Pa. P. U. C.*, 370 Pa. 305, 88 A. 2d 59, applies with equal force to the present situation. The appeal in that case presented the question whether a deficiency in a pension fund should be borne by the company or by the ratepayers. Mr. Justice CHIDSEY said: "Someone must pay the pension costs properly attributable to past services. At the present time such costs can be placed upon present and future rate payers or the investors in the Company. In the present situation the test for determining where the burden should be placed as between these two classes of individuals is whether management abused its discretion in 1927 by not placing the full cost on the ratepayers from that time on. If they did, the investors for whom they acted should bear the cost. If they did not, there is no valid legal objection to placing the burden on present and future ratepayers. Since we have already demonstrated it cannot properly be held that management abused its discretion in 1927, the costs of pensions including the freezing payment were correctly included by the Commission as an operating expense". The present record shows no abuse of discretion by Duquesne, nor is any such abuse asserted. We have therefore concluded that the case must be remanded to the Commission for redetermination of the allowance for annual depreciation expense.

## Conclusion

To summarize, we find no errors in the Commission's order except with regard to (1) the making of an adjustment for the elimination of the excess profits tax without making a corresponding adjustment for the wage increase; and (2) the allowance for annual

depreciation expense. In the latter connection we are not to be understood as indicating that the remainder investment approach should always be followed. In the case at bar, however, we cannot now approve a complete change in policy to the Company's prejudice.

## Order

The order of the Commission is reversed, and the record is remanded to the Commission with instructions to proceed in a manner consistent with the views expressed in this opinion.

---

DISSENTING OPINION BY RHODES, P. J.:

I dissent from the conclusion of the majority. I would affirm the order of the Commission. The majority opinion reverses the order of the Commission and remits the record with direction to apply the remainder life theory in computing Duquesne's annual depreciation allowance. Having assumed the genuineness of the deficiency in the book reserve in a prior proceeding, the Commission might have allowed the additional annual depreciation of $412,000 under the remainder life theory in this case. The Commission, if it concluded the circumstances warranted, could have accepted the utility's book estimate and this would have been within the sphere of its authority. *Harrisburg Steel Corporation v. Pennsylvania Public Utility Commission*, 176 Pa. Superior Ct. 550, 109 A. 2d 719. But the Commission is not obliged to repeat or perpetuate an error and we should not require it to do so. The addition of $412,000 to annual depreciation as directed by the majority may not be important in so far as the amount is concerned when considered in relation to Duquesne's allowable annual operating expenses, but the principle involved is of far-reaching consequence to the regulatory process. The majority of this Court

are attempting to substitute their judgment for the discretionary power of the Commission. The result of this unwarranted interference with the prerogatives of the Commission is to direct Commission action on what is essentially an economic problem.

Preliminarily it is well to remember that the regulation of public utilities, including the exercise of the rate making power by the Commission, is not an exact science, and calculations cannot always be made with mathematical precision. This is illustrated by reference to the recent history of this utility. The Commission in its order of March 9, 1953, in holding that tariff No. 11 was not unreasonable or discriminatory, found that allowable revenues were excessive in the amount of $652,739. The Commission nevertheless decided that it was impractical to design rates that would reduce revenues within such narrow limits; and Duquesne has thereby been permitted to receive this excess in annual revenues. See *City of Pittsburgh v. Pennsylvania Public Utility Commission,* 171 Pa. Superior Ct. 187, 90 A. 2d 607; *Duquesne Light Company v. Pennsylvania Public Utility Commission,* 174 Pa. Superior Ct. 62, 99 A. 2d 61.

In its order of August 29, 1951, the Commission allowed Duquesne $4,998,282 for annual depreciation on its plant. The annual depreciation allowance on Duquesne's electric plant consisted of straight-line reserve allowance of $4,554,727, and a remainder life allowance of $443,555. Duquesne there contended that the Commission's allowance for annual depreciation should be based upon replacement cost at current prices. We recognized that allowance for annual depreciation should be calculated to permit the utility to recover the original cost of its property; and we sustained the Commission's calculation of the allowance for annual depreciation, being necessarily a judg-

ment figure. *City of Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 171 Pa. Superior Ct. 187, 212, 213, 90 A. 2d 607. Under the facts of that rate proceeding the application of the remainder life theory was discretionary with the Commission. In the present proceeding the Commission had the power to determine that the remainder life theory should not be applied, and its conclusion is based upon substantial reasons.

In the present order of December 22, 1953, the Commission made an annual depreciation allowance to Duquesne of $6,529,377, including Elrama No. 2 power plant. It is conceded that on the basis of the reserve requirement study there would be a deficiency in Duquesne's book reserve for depreciation. The Commission refused to amortize this deficiency by making provision for it in the annual depreciation charge. Duquesne claims that this resulted in confiscation of $12,-000,000 of the original cost of its property.

The allegation of confiscation must be sustained by the evidence submitted by the utility, and the Commission is not obliged to establish the nature or validity of an inadequacy in the utility's book reserve. It is only upon proof by the utility or upon an assumption that the deficiency in the book reserve was due to the utility's insufficient past earnings or collections from consumers to compensate the utility for property consumed in rendering past service that it can be said that Duquesne will not receive over the expected service lives of the units of property their full original cost. Present rate payers are not to be charged for a failure of a utility to allocate adequate amounts to its book reserve for depreciation whether such bookkeeping entry is intentional or the result of erroneous methods. The correction of a utility's book reserve for depreciation should be made through surplus in the

absence of evidence acceptable to the Commission that
the deficiency is genuine. If genuine it would be proper to amortize the deficiency as an operating expense over the remaining expected service life of the property units. See *Northwestern Wisconsin Electric Co.,* 40 P.U.R. (N.S.) 202, 204.

Depreciation is defined as the expense occasioned by the using up of physical property employed as fixed capital.* An annual depreciation allowance in rate making is an expense item designed to permit the utility to recover over the estimated service life the original cost of the property devoted to the public service. In making such allowance the Commission must be guided by the record before it. Its findings must be supported by evidence, and the weight to be given any particular item of evidence is for the Commission. To avoid confusion and misunderstanding it may be expedient to employ an elementary approach and analyze the problem presented by the utility's claim of confiscation by reason of the Commission's failure to take into account the alleged deficiency in its book reserve in arriving at an annual depreciation allowance. The term "deficiency in the book reserve for depreciation" means only that the total amount recorded on the utility's books in the reserve for depreciation account is less than the amount which is indicated by a present reserve requirement study, which is an analysis of the utility's recent experience in retiring from service its units of property for various causes. The question presented can be readily understood by use of a concrete, simplified example as given by the Commission in its brief in these appeals. Let us assume a unit of property

---

* "Broadly speaking, depreciation is the loss, not restored by current maintenance, which is due to all the factors causing the ultimate retirement of the property." *Lindheimer v. Illinois Bell Telephone Co.,* 292 U. S. 151, 167, 54 S. Ct. 658, 78 L. Ed. 1182, 1192.

costs $15,000 when installed, and that the estimated service life on the books of the utility at installation was fifteen years. Annual depreciation credited to the book reserve would be $1,000 per year and at the end of five years the book reserve would be $5,000. Assume that at the end of five years a present reserve requirement study based on the latest available evidence shows the proper estimated service life at ten years instead of fifteen years as computed in the book reserve. Ignoring for the moment the book reserve, under the present reserve requirement study the proper annual depreciation allowance, representing the true current annual depreciation expense chargeable to present cost of service, would be $1,500, that is, a ten-year life at $1,500 per year would recover an original cost of $15,-000.

Briefly, the remainder life theory if applied requires that the Commission consider any deficiency (or excess) between the book reserve or any prior depreciation study and the present reserve requirement study, and add to the annual depreciation allowance (or in case of an excess to subtract) an amount sufficient to cover over the remaining service lives the deficiency or excess. In this illustration if the book reserve is to be accorded full weight due to the change in estimated service life from fifteen to ten years there is a deficiency in the book reserve of $2,500; $7,500 should have been accrued on the books in half the life of the property, to wit, five years, instead of $5,000 which the books actually show. Where the Commission applies the remainder life theory it makes an additional allowance (in this example $500 a year, $2500/5 yrs.) sufficient to permit the utility to amortize the deficiency, which it has created, over the remaining estimated service life of the property. On the other hand, if there was an excess of $2,500 between the book re-

serve and the present reserve requirement study, the same principle would apply and the Commission would reduce the annual depreciation allowance by $500 per year if it applied the remainder life theory. Extending the life of the property on the books and thereby reducing the annual amount entered in the book reserve for depreciation regardless of adequate earnings, increases the amounts available for dividends or other reserve.

The Commission presents two reasons why it should not be compelled to apply the remainder life theory in any given case.

First, the Commission argues that application of the remainder life theory should depend on whether it is established, in a given case, that the deficiency, or excess, between the present study and the book reserve is in fact genuine, as distinguished from a mere difference between the two estimates. The genuineness of the deficiency, or excess, in turn hinges upon the question whether the utility in the past made more or less than a fair return (on fair value) over the years in question. If there is a deficiency and the utility has earned no more than a fair return on fair value then the deficiency would be genuine. Where there is a deficiency and the utility has in fact earned more than a fair return, to the extent that the utility has earned more than a fair return, the deficiency has no validity. Where an excess appears in the book reserve and the utility has earned at least a fair return on fair value the excess may be considered genuine. But where the utility has not earned at least a fair return the excess would to that extent be false.

Secondly, the Commission takes the position that, since it is a practical impossibility to try a rate case involving prior years, the Commission cannot be required to apply the remainder life theory in any given

case, but may properly base its annual depreciation allowance on the present reserve requirement study (the latest available evidence) which represents the true current annual depreciation expense chargeable to present cost of service. The Commission states in its brief: "Thus, the Commission now reasons that the present depreciation expense incurred in furnishing present service is the only proper basis for determining allowable operating expenses and that to amortize either a deficiency or an excess by increasing or decreasing present depreciation expense is to distort the present cost of property consumed in rendering service."[1]

I think the answer is obvious when the problem is thus analyzed. The Commission should give the utility everything to which it is entitled. This is done when it makes a reasonable annual depreciation allowance based upon a present reserve requirement study, which is a sufficient basis for recovery of full original cost. This conclusion is fortified when we consider the nature of an annual depreciation allowance in relation to accrued depreciation. In *Clark's Ferry Bridge Company v. Public Service Commission*, 108 Pa. Superior Ct. 49, 74, 165 A. 261, 270, we said: ". . . annual depreciation should bear some fair relation to the accrued depreciation. We do not mean to say that they should be calculated on the same basis, for the accrued depreciation represents the actual depreciation which has occurred and which may be discovered by inspection and examination, while the annual depreciation allowance is a theoretical allowance made from year to year, . . ."

---

[1] The Commission in its brief (pp. 77-83) gives a convincing illustration of the inequitable results from the application of the remainder life theory solely on the mere presence of a deficiency or an excess in a utility's book reserve for depreciation.

There is no logical or rational basis upon which the majority directs the Commission to apply the remainder life theory in this case. Reversal of the Commission's order is not upon the ground of confiscation which is urged by the utility. The majority states that the present record shows no abuse of discretion by Duquesne relative to the creation of its book reserve. The validity of the deficiency is assumed by the majority and a correlation of the present reserve requirement study with the book reserve or a prior finding of depreciation thereupon becomes mandatory. As a consequence of such judicial interference with the Commission's administrative powers consumers may be required to compensate a utility for its investment more than once. The Commission in some cases has also acted upon the assumption that the mere fact of the existence of a deficiency in the book reserve for depreciation established that the utility's past collections from consumers were in fact deficient. Such assumption, inherent in the application of the remainder life theory, is that the utility is always earning precisely a fair return, no more and no less. But, as the Commission says: "Considering the problem as solely one involving the amounts charged in the past on the books of account as depreciation expense ignores the more cogent and determinative questions of past earnings and present cost of service." Of course the findings of annual depreciation in previous cases are not res judicata. The annual depreciation allowances vary under changing conditions as appears by reference to the respective proceedings involving Duquesne, and no formula can be prescribed by this Court controlling the Commission's administrative powers in such matters.

A fundamental error in the majority opinion is an assumption that the Commission's refusal to give weight to the deficiency between the book reserve and

the present reserve requirement study results in an annual depreciation allowance which will not enable the utility to recover the full original cost of its property. It is erroneous to say that unless the deficiency in the book reserve is taken into account full original cost will not be recovered. True, the Commission says in its brief that, "based on the amount of the Commission's allowance for annual depreciation expense in this case, Duquesne will not receive over the expected service lives of the units of property their full original cost." The majority has entirely misconstrued the limited import of this statement. Fundamentally, as the Commission points out, an annual depreciation allowance based on a present reserve requirement study alone represents the true present cost of service and gives the utility its full rights in a rate proceeding, that is, recovery of full original cost on the basis of the present reserve study used. Consequently, the Commission meant only that where full weight is accorded the book reserve, in comparison with the present study, then any variation shown must be taken into account in order to insure recovery of full original cost. Of course, if by hypothesis the Commission must give full weight, or any weight, to a deficiency in the book reserve, it will have to take such deficiency into account in arriving at an annual depreciation allowance that will allow recovery of original cost. To accept the deficiency or the book reserve at face value is to assume that prior accrual rates have been genuinely deficient, and hence the deficiency must be taken into account in order to recover full original cost.

Essentially, the problem is one of the weight to be given to evidence by the Commission. It can disregard the book reserve and base annual depreciation entirely on the present reserve study, or it can give some weight

to the book reserve or even full weight thereto.[2] The majority opinion recognizes this power of the Commission in affirming the Commission's determination of accrued depreciation, but denies it when the Commission considers annual depreciation. Under the heading "Accrued Depreciation" the majority opinion states: "The Commission had before it the following: a reserve requirement study by the City, a reserve requirement study by Duquesne, the finding of the Commission in the prior rate proceeding, and the book reserve. The Commission did not consider the book reserve controlling since it had not been accumulated on actual service life but from percentages of revenues and by lump sum appropriations from surplus."

The only logical rule, therefore, is that the Commission should have discretion as to what weight, if any, it will give to the book reserve in a given case as compared to the present reserve study. For instance, admittedly here the book reserve was computed

---

[2] In *Harrisburg Steel Corporation v. Pennsylvania Public Utility Commission*, 176 Pa. Superior Ct. 550, 109 A. 2d 719, a present reserve requirement study revealed that the balance in the company's book reserve for depreciation was $9,711,287 less than the accrued depreciation indicated by the reserve study as having actually occurred. The company thereupon transferred $5,000,000 from surplus, subject to the approval of the Commission, and in its rate proceeding proposed to amortize the remaining deficiency of $4,711,287 as an allowable operating expense over the remaining average service life of the property. The Commission, in amortizing the deficiency, allowed $118,250 annually as an operating expense for rate purposes, having accepted within the sphere of its authority the company's estimate. We affirmed the Commission in applying the remainder life theory under the circumstances and increasing the annual depreciation allowance accordingly.

In *Pennsylvania Public Utility Commission v. Equitable Gas Co.*, C. 15581, August 11, 1953, the Commission refused to amortize an excess in book reserve by decreasing the depreciation expense allowance.

primarily on gross revenues and not at all on any study of service lives or rate of annual depreciation. On the record the Commission was entirely justified in giving no weight to the book reserve, that is, refusing to apply the remainder life theory. There was no proof of confiscation shown, as alleged by the utility. In any event, the burden is upon the party alleging it to prove confiscation. "The point is as to the necessity for the annual charges for depreciation, as made or claimed by the Company, in order to avoid confiscation through the rates in suit. On that point the Company has the burden of proof." *Lindheimer v. Illinois Bell Telephone Co.*, 292 U. S. 151, 54 S. Ct. 658, 78 L. Ed. 1182, 1197. Duquesne made no attempt to meet that burden.

The majority opinion relies upon several erroneous grounds for directing the Commission to apply the remainder life theory in this case. In the majority opinion it is said: ". . . there is nothing to show that the Company was guilty of any faulty past practices in accumulating its book reserve, or that the conceded deficiency therein is not genuine. In fact, in 1937 the Commission expressly approved the Company's reserve for depreciation and its annual accruals. . . . The present record shows no abuse of discretion by Duquesne, nor is any such abuse asserted. . . . we are not to be understood as indicating that the remainder investment approach should always be followed. In the case at bar, however, we cannot now approve a complete change in policy to the Company's prejudice."

(1) Alleged approval of the utility's reserve in prior proceedings was expressly limited to and for the purposes of the particular proceeding. Assuming such approval was made in prior proceedings, it does not bind the Commission here. Prior rate proceedings or the particular findings therein are not res judicata of

subsequent rate cases. *Philadelphia v. Pennsylvania Public Utility Commission,* 173 Pa. Superior Ct. 38, 52, 95 A. 2d 244; *Pittsburgh v. Pennsylvania Public Utility Commission,* 174 Pa. Superior Ct. 4, 98 A. 2d 249.

(2) The fact that the Commission applied the remainder life theory and allowed Duquesne to amortize an alleged deficiency in the book reserve in the 1951 proceeding does not, by any logic or reason, require this Court to direct the Commission to apply such remainder life theory here. In the 1951 proceeding the Commission applied the remainder life theory and we affirmed such action. *Pittsburgh v. Pennsylvania Public Utility Commission,* 171 Pa. Superior Ct. 187, 90 A. 2d 607. Here the Commission refused to apply the remainder life theory, and the question raised is whether it is bound to apply the theory under a plea of confiscation by the utility. This question was not involved in the 1951 case. Approaching the problem on the basis of fundamentals, it is clear that, where the Commission applies the remainder life theory, its action is not necessarily erroneous, but the Commission is not bound to apply such theory in any given case, any more than it is precluded from changing its prior approval of a fuel adjustment clause in the exercise of its functions as an administrative agency of the legislature. Let us suppose an excess, rather than a deficiency, in the book reserve was involved here. I am confident that the utility would vigorously protest against application of the remainder life theory and the consequent deduction from its annual depreciation allowance. The underlying principle is the same. Former application of the remainder life theory, even involving the same utility, does not determine the present question one way or the other.

(3) The exercise of discretion by utility management and observance of Commission rules regarding annual depreciation accruals are not here involved. The case of *Pittsburgh v. Pennsylvania Public Utility Commission*, 370 Pa. 305, 88 A. 2d 59, has no application to the present appeals. The question there was whether ratepayers or stockholders should be charged with an admitted actuarial deficiency in the pension fund. Here the question is whether an alleged deficiency between book reserve and a present reserve study is genuine, and whether such deficiency ipso facto must be accepted by the Commission in computing a reasonable annual depreciation allowance.

(4) For like reasons, we are not concerned, as the majority assumes, with questions of fairness, prejudice, estoppel, or change in Commission policy. The Commission's refusal to continue to accept at face value self-serving book entries of a utility would not be a prejudicial change of policy.

The majority directs the Commission to make adjustment for a wage increase, not in the record, since the Commission made an adjustment to reflect the elimination of the excess profits tax. Admittedly, the Commission should consider the latest available relevant evidence in computing expenses and income, but, at the same time, it is given discretion as to what adjustments shall be made to base year figures. *Duquesne Light Co. v. Pennsylvania Public Utility Commission*, 174 Pa. Superior Ct. 62, 69, 99 A. 2d 61. In the exercise of its discretion the Commission made the adjustment to reflect elimination of the excess profits tax, but refused to consider a wage increase which was not in the record. In directing the Commission to take into account the wage increase, or eliminate it and the tax item, the majority is again arrogating to itself an exclusive function of the Commission.

In its final order of December 22, 1953, in these appeals the Commission found the proposed rates in tariff No. 12 to be unfair, unreasonable, and unlawful. The Commission went further and modified the fuel clause proposed by Duquesne in tariff No. 12, which was substantially the fuel clause contained in tariff No. 11. This modification of the fuel clause, prescribing a variable instead of a fixed thermal efficiency factor, was designed to limit the application of the fuel clause to fuel expense actually incurred. It was estimated that such modification in the fuel clause would, on the basis of current fuel cost, produce a reduction in payments by industrial consumers subject to the fuel clause of $1,811,000.

The majority opinion affirms the Commission in directing modification of the fuel clause. However, throughout the majority opinion language is used which treats this order of the Commission modifying the fuel clause as making a reduction in basic rates or revenues therefrom. Under the principles announced in *Magee Carpet Co. v. Pennsylvania Public Utility Commission*, 174 Pa. Superior Ct. 438, 102 A. 2d 229 (allocatur refused), it is clear that a fuel adjustment clause has a limited purpose, that is, to provide for the adjustment of charges for service to a consumer to directly reflect the changing fuel cost to the utility. The modification of the fuel clause in this case had no effect on the basic rates or allowable revenues; and the resulting change in receipts under present fuel costs cannot be considered a change in basic rates or a reduction in allowable revenues. In the *Magee* case we said (page 447 of 174 Pa. Superior Ct., page 234 of 102 A. 2d): "A fuel adjustment clause should stabilize, not augment, the allowable return of the utility from its basic rates." For these reasons it is obvious that the majority ruling—that under the language of

section 308 of the Public Utility Law, 66 PS §1148, the Commission may on an application for increase in rates direct a reduction in existing rates and revenues—is entirely beside the point and has no relevancy to the issue.